D. W. PIERCE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 92278. Promulgated May 28, 1940.

*Maurice C. Sparling, Esq.*, for the petitioner.
*E. A. Tonjes, Esq.*, for the respondent.

## OPINION.

HILL: We are called on to decide here whether the petitioner's payment of $24,506.46 on his guarantee of the indebtedness of his son is (1) a contribution to the capital cost of stock held by the petitioner which he sought to protect by his guarantee, (2) a gift to his son made when the business affairs of the son did not warrant a prudent loan, or (3) a loan made to his son, ascertained by the petitioner to be worthless in 1933 and charged off at that time.

The first position we consider untenable here. The amounts paid out on his guarantees by the petitioner did not go into the corporations to which it is contended capital contributions were made, cf. *B. Estes Vaughan*, 17 B. T. A. 620; *Burns v. Commissioner*, 31 Fed. (2d) 399; certiorari denied, 280 U. S. 564; *In re Park's Estate*, 58 Fed. (2d) 965; certiorari denied, 287 U. S. 645, nor were they applied to the discharge of corporate obligations. See *J. S. Maubaules*, 20 B. T. A. 359; *W. F. Bavinger*, 22 B. T. A. 1239; *Jeremiah G. Menihan*, 29 B. T. A. 169; affd., 79 Fed. (2d) 304; certiorari denied, 296

U. S. 651. Expenditures other than for these purposes which may in some indirect way improve the position of the petitioner's investment can not be held contributions to capital under ordinary circumstances. *John P. Dillon*, 9 B. T. A. 177; *Seufert Brothers Co.* v. *Lucas*, 44 Fed. (2d) 528.

In *George M. Wright*, 18 B. T. A. 471; affd., 47 Fed. (2d) 871, the stockholders of a corporation, among whom was the taxpayer, surrendered 50 percent of their stock holdings to the company's bankers pursuant to a plan by which the bankers agreed to refrain from placing the corporation in bankruptcy if one-half of the shares were surrendered to them to be paid over as compensation to the new management which they had secured for the company. We held that the value of the stock surrendered could not by virtue of the indirect benefit which came to taxpayer's remaining investment be labeled a contribution to capital and allowed its deduction as a loss. On largely similar facts we reached the same conclusion in *City Builders Finance Co.*, 21 B. T. A. 800. See also *First National Bank of Skowhegan, Maine*, 35 B. T. A. 876; *Robert Gaylord, Inc.*, 41 B. T. A. 1119. Cf. *Putnam Trust Co.*, 26 B. T. A. 655.

These holdings point to the conclusion that outlays made by an owner-investor may not be considered capital contributions when they are paid to outsiders and engender only a secondary or indirect benefit for the capital invested. As we said in *City Builders Finance Co., supra*, at page 804:

We believe that the situation here is that petitioner, impelled by the untoward exigencies confronting it, surrendered 32½ shares of its stock * * * for which it received no direct compensation, and if any benefit of any kind inured to it, it was only the indirect benefit, as a stockholder, of having the corporation put in a more strategic position * * *

The petitioner has testified that beside the more immediate objective of protecting the position of his son, he hoped by his guarantees to prevent the sale of the stock held as collateral in order to protect the price of similar securities held by him. Under the cases cited we think it plain that this benefit to petitioner's investment flowing indirectly from these outlays is not sufficient to render them contributions to capital.

The respondent must fail also in his alternative contention, that the funds paid out by the petitioner may not be regarded as loans, but were gifts made to his son. Respondent's argument is based on his allegation that the financial position of the petitioner's son during the period of the first guarantee and the subsequent increases was so insecure as to render any advances imprudent from a business standpoint and more in the nature of gifts. He assigns the close relation between the petitioner and his son as the reason for the advances and a further basis for branding the outlays as gifts. The evidence,

however, is clear that the petitioner's son was solvent by a safe margin at the time of the original guarantee and the increase on September 29, and that petitioner felt assured during the entire period from September 4, 1930, through December 28, 1931, that the position of his son if protected at those times by petitioner's guarantees would ultimately be saved by the later increased value of the collateral. The petitioner, as an officer of the corporations the stock of which was held as collateral, was in a favorable position to pass judgment as to the fair value of the stock so held and its future prospects, and he has stated his opinion that it was worth at least double its market value in September 1930. While we do not accept this testimony as conclusive of the value of the stock, we think it sheds light on the petitioner's intentions and objects in making the guarantees. See *Daniel Gimbel*, 36 B. T. A. 539. The petitioner regarded these dealings as sound from a business standpoint and this regardless of the personal relationship which obtained between him and the debtor, his son. The guarantee which petitioner made in October 1930 of the indebtedness of one J. C. Howard, a legal stranger, we think strengthens this impression.

The petitioner was prompted to make the guarantees for an additional reason which we think furnishes valid basis for holding that these advances were not gifts. The primary objective, as we have noted, of the guarantees was to protect the market value of securities held by the petitioner. Advances made for such purposes are closely related to business expenses and when intended to be in the form of a loan are clearly deductible when the resultant debt becomes worthless.

Here, the evidence points conclusively to the fact that the petitioner intended to hold his son as a debtor in whatever amount he was required to pay on the guarantees. This intent is made plainer by the execution of the note in the amount of $20,000. We do not take this latter fact, however, as an indication that the additional $4,506.46 was meant as a gift. The entire amount must be reckoned as a single transaction. It seems clear, further, that D. W. Pierce, Jr., was hopelessly insolvent at the time the petitioner made his payments and that the debt became worthless as soon as it came into being. Whether the $4,506.46 difference between the debt and the note is properly explained, as the petitioner alleges, by the fact that when the note was signed the exact amount of the guarantee payment had not been ascertained or by some other fact, the entire debt was ascertained to be worthless immediately after the payments in June 1933, and it is thus a proper deduction in that year. *Shiman* v. *Commissioner*, 60 Fed. (2d) 65; *H. Rodney Sharp*, 38 B. T. A. 166; *Daniel Gimbel, supra.*

*Decision will be entered for the petitioner.*