ESTATE of James A. ELKINS et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 76–H–611.

United States District Court, S. D. Texas, Houston Division.

Sept. 25, 1978.

Charles T. Newton, Jr., N. L. Stevens III, Houston, Tex., for plaintiffs.

Louise G. Parks, Dallas, Tex., for defendant.

## MEMORANDUM OPINION AND FINDINGS OF FACT

COWAN, District Judge.

James A. Elkins (hereinafter "Elkins, Sr.") was one of the founders of the banking complex which is now First City Bancorporation. Elkins, Sr. is also the founder of a law firm which is now known as Vinson & Elkins.

Elkins, Sr., died May 7, 1972, leaving a substantial estate. Mrs. James A. Elkins died September 28, 1969. The estates of Mr. and Mrs. Elkins have paid a total of $1,515,834.95 in federal estate taxes.

The issue in this case is whether or not the estates of Mr. and Mrs. Elkins are entitled to deductions for claims against their estates by their sons, James A. Elkins, Jr. and William S. Elkins. The undersigned has determined that the estates are entitled to deductions for the claims of the sons, and the purpose of this memorandum is to set out findings of fact and conclusions of law upon which the undersigned relies to arrive at this conclusion.

Over the many years of his productive life, Elkins, Sr. was engaged in various enterprises. During the years before 1955, Elkins, Sr. and his sons, James, Jr. and William, were owners of an interest in a legal entity which held title to the Esperson Building. In 1955, the Esperson Building was sold, and this transaction resulted in the infusion of a substantial amount of cash into the accounts of Elkins, Sr., James A. Elkins, Jr. (hereinafter "Elkins, Jr.") and William S. Elkins. In 1955 Elkins, Sr. was in a higher tax bracket than his sons, and was heavily invested. At the time of the sale of the Esperson Building, his needs for cash exceeded those of his sons. Accordingly, each of his sons made to him a loan, evidenced by an interest-bearing note. Some years after the loans were made, payments of interest and principal were made,

and then apparently through mutual agreement of the parties, the payments ceased.

One of Elkins, Sr.'s most predominant assets was a block of stock in the First City National Bank.

Starting in the mid-1950's Elkins, Sr.'s tax counselor, Marvin K. Collie, commenced efforts to persuade Elkins, Sr. to make substantial gifts to his descendants for the purpose of minimizing inheritance taxes. Elkins, Sr., until 1964, resisted this advice, stating that he did not have sufficient cash to pay gift taxes. An active, aggressive entrepreneur, Elkins, Sr. remained "fully invested," committing both his income and his borrowing power to the development of various enterprises in which he was active.

In 1964, Mr. Collie again urged Elkins, Sr. to make substantial gifts. By this time Elkins, Sr. was over 80 years of age and in failing health. In addition, Collie, an active tax practitioner, was convinced that changes in the law were imminent which would make it more difficult for a donor to minimize estate taxes by making substantial gifts before death. Collie advised Elkins, Sr., that even if he did not have the cash to pay the gift tax, that he, Elkins, Sr. should still make the gifts, and borrow the money for the purpose of paying the gift taxes. At the time of Collie's advice to Elkins, Sr. there was no discussion concerning the source of the borrowing, and there is no evidence that Elkins, Sr. or any other person at the time of the basic decision to make the 1964 gifts, contemplated borrowing from the donees.

In addition to the desire to minimize estate taxes, it is also inferable, and the Court does infer, that Elkins, Sr. was ultimately willing to make the 1964 gifts because of his desire to enable his two sons to maintain a substantial equity position in the First City National Bank. In this connection, at that time Elkins, Jr. was Chairman of the Board of the First City National Bank, and William Elkins, a lawyer, was in charge of the legal work for the First City National Bank.

The initial gifts of First City National Bank stock were made in the latter part of 1964. The gift tax did not become due until April of 1965. There is no evidence that Elkins, Sr. extracted from his sons an agreement to lend him money or pay the gift tax in return for the gifts. Any such inference would be mere speculation and conjecture. The most reasonable inference is that at the time of making the initial gifts of First City National Bank stock in December of 1964, no definite decision had been made concerning where and how the funds to pay the gift tax were to be borrowed.

By April of 1965, when the gift tax became due, Elkins, Sr. was confined in the hospital, where he remained for seven years before his death. Elkins, Sr., while a very wealthy man, still found himself in essentially the same awkward position as most older persons: his income was being reduced, while his expenses were increasing dramatically. In addition, his age and ill health made him reluctant to commit himself to the definite repayment schedule which would have been required in the case of a conventional institutional loan. Accordingly, primarily for the purpose of accommodating Elkins, Sr.'s advanced years and declining health, Elkins, Jr. and William Elkins arranged to borrow the money to pay the gift tax themselves, from institutional lenders, and loaned the money to their father. These borrowings by Elkins, Jr. and William Elkins from institutional lenders were, over a period of years, repaid in full, and it is established without question that the funds in question were actually transmitted from Elkins, Jr. and William Elkins to Elkins, Sr.

The key factual inquiry in this case is whether Elkins, Jr. and William Elkins intended for their father to repay the sums which they advanced. The fact that Elkins, Jr. and William Elkins themselves borrowed the funds to loan to their father, paid substantial amounts of interest on the borrowed money and eventually repaid the money over a period of years, is certainly strong evidence of an intent on the part of Elkins, Jr. and William Elkins that they would be repaid.

The following year, in 1965, Elkins, Sr. made additional gifts of First City National Bank stock to his two sons, and the sons made additional borrowings from a different institutional lender, and loaned this money to their father which he used to pay the gift tax on the donations.

The 1964 and 1965 loans from sons to father were not evidenced by notes, but were carried on the books of the sons as assets and on the books of the father as accounts payable.

In 1964 and 1965 Elkins, Sr. was over 80 years of age, in failing health and actually living in a hospital. It is inferable that no one expected him to live very long. Probably to everyone's surprise, Elkins, Sr. lived seven more years. During this period he was in bad health much of the time, confined to a hospital and incurring extremely large medical expenses. Understandably, his sons did not press him for payment or require him to pay interest upon the advances; however, the evidence shows with virtual conclusiveness that the sons intended to be paid and that the father intended that the obligation would ultimately be discharged.

During the final years of his life, Elkins, Sr. drafted, through his tax counselor Marvin Collie, a number of different wills. His ultimate will was drafted in 1968. Contrary to the contentions of the United States in its initial briefs here, Elkins, Sr. did not leave the bulk of his property to his sons. His basic testamentary plan was that the bulk of his assets would be placed in a charitable trust, that the income from the charitable trust would be dispersed to various charities over a period of 20 years, and at the end of the 20-year period, the remaining assets would go to his various descendants. His sons would be entitled to receive funds from the trust or from the assets only in the unlikely event that their financial condition was such that the sons needed the money. For all practical purposes, the sons were excluded from the father's testamentary disposition, and the sons' generation was "skipped."

Before finally executing his 1968 will, "skipping" his sons' generation, Elkins, Sr. asked Mr. Collie to discuss the matter with both Elkins, Jr. and William Elkins. While neither of the sons objected to the father's testamentary plan, William Elkins was understandably anxious that the advances which he had made to his father with funds which he, himself, had borrowed and then paid, would be paid to him. For the purpose of insuring that these loans would be paid, the following clause was inserted into Elkins, Sr.'s 1968 will:

My Executors and Trustees shall pay any of my debts to my sons without regard to any statute of limitations.

The United States contends that this provision was too vague to constitute an acknowledgement of the indebtedness to the sons, and despite this will provision, that the claims of the sons were unenforceable. The United States' contention seems unpersuasive because the will provision relates to "any debts" from the father to the sons. In addition, when the will is construed in the light of the family's circumstances, it is apparent that Elkins, Sr., the testator, was referring to the very loans which are here in controversy.

The United States also contends that the claims of the sons are not deductible because they would not have been enforceable. While the parties briefed this question with great thoroughness and cite multiple cases, the entire answer to this aspect of the matter, in the undersigned's judgment, rests in Rule 94, Texas Rules of Civil Procedure, which provides that:

. . . In pleading to a preceding pleading, a party shall set forth affirmatively . . . the statute of limitations, . . . and any other matter constituting an avoidance or affirmative defense.

The executor of Elkins, Sr.'s will was prohibited by the instrument which gave him authority from pleading the statute of limitations. The claims of the sons were fully enforceable, and the estate, had it attempted to resist payment, would have had no defense.

■ The events relating to the execution of the 1968 will (i. e., William Elkins' desire that payment of his claim be insured, and Elkins, Sr.'s conclusion in his will of the provision discussed above) prove, almost conclusively, the intent of William Elkins and Elkins, Sr. It is fairly inferable that the intent with reference to Elkins, Jr. was identical.

In 1970 another event occurred which demonstrates dramatically and almost conclusively, the intent of the parties with reference to this indebtedness. William Elkins was divorced. In connection with his divorce settlement, it was his desire and that of his advisers to remove his ex-wife from any contact with the Elkins family enterprises. Accordingly, in the division of the community assets, William Elkins retained the claim against his father and made provision for his wife, on a dollar for dollar basis, i. e., made certain that his wife, in the division of the community assets, was given assets which corresponded in value to the value of his claim against his father. Certainly, had there been any question concerning the enforceability of the William Elkins claim, or the intent that it be paid, division of William Elkins' community estate would not have proceeded in this manner.

In an effort to analyze the criteria which have been applied by the courts in determining whether or not an intra-family loan is "bona fide," the undersigned has attempted to review most of the cases relating to this problem. As will be demonstrated in the analysis set forth below, the key inquiry in all of these cases is: "Was there an intent by the parties that the loan be repaid?"

The cases do not negate bona fides simply because a family member was willing to make concessions to his family member which he would not have made to a stranger. The cases do not require that the loan, in order to be "bona fide," bear interest, be evidenced by documentation in the form of a note or otherwise, or require that the loan be the result of arm's-length bargaining. The key factor is, as the Court analyzes

these cases, intent that the loan be, at some time, repaid.

Pursuant to its duty to represent the Internal Revenue Service aggressively, the United States contends that there is a requirement that a loan be negotiated under "arm's-length" conditions, and that there be an intent to repay during the debtor's lifetime. Congress, however, in passing the applicable statute, imposed no such requirements.

The following facts, in the undersigned's opinion, conclusively establish the intent of the debtor, Elkins, Sr. to repay and the intent of the lenders, Elkins, Jr. and William Elkins, to be repaid:

1. The amounts were carried as assets on the books of the sons, and as accounts payable on the books of the father consistently through the years. The parties maintained formal records of these transactions in a business-like manner, using the normal "double entry" bookkeeping method, and the transaction was consistently handled as a debt transaction on the books of all of the parties.

2. The funds loaned from the sons to the father were not just moneys idly languishing in a safe-deposit box for which the sons had no use. On the contrary, these were funds which the sons themselves borrowed, and upon which they paid substantial rates of interest and repaid over a period of years.

3. The circumstances concerning inclusion of Clause 65 in the Elkins, Sr. will is consistent only with an intent to repay, and an intent to be repaid.

4. The handling of the indebtedness in connection with William Elkins' 1970 divorce is consistent only with an intent to repay and to receive payment.

5. The direct testimony of James Elkins, Jr., William Elkins and Marvin Collie, all support an intent to repay on the part of the debtor and an intent and expectation of receiving payment on the part of the creditors. The undersigned accepts the credibility of this

testimony and finds it supported by all of the circumstantial evidence.

6. While Elkins, Sr. never, according to his tax consultant Collie, allowed excessive amounts of cash to lie idly in a demand account, or savings deposit box Elkins, Sr.'s assets were always sufficient so that his sons had every expectation of repayment at sometime in the future.

*Analysis of Cases Relating to Intra-Family Loans*

*Estate of Van Anda v. Commissioner*, 12 T.C. 1158 (1949), affirmed per curiam 192 F.2d 391 (2nd Cir. 1951) supports the view that the crucial inquiry in cases of this nature is: Was there, in fact, a firm intent on the part of the creditor to receive payment and intent on the part of the debtor to pay at some time in the future. *Van Anda* actually involved a situation in which a husband and wife simply bought a second home, or continued to live in the second home as their principal home, and the decedent attempted to structure this common situation in the form of an unusual loan which the wife had no means of actually repaying. In the case at bar, Elkins, Sr. always had adequate assets from which the loans could have been repaid if the sons had insisted upon repayment. In addition, there was no effort, in the case at bar, to disguise the transaction or make it look like something it was not—on the contrary, the transaction simply had all of the indicia of a loan between friendly family members with kind feelings for one another.

The key fact in the *Estate of Beatrice Labombarde*, 58 T.C. 745 (1972) is that at the time the initial advances of property were made from the children to the mother, there was clearly no expectation of repayment or intent to repay. At a much later date, after consultation with counsel, very sophisticated after-the-fact documentation was prepared which obviously did not reflect the parties' intent at the time the transfers of funds were made.

*Glascock v. Commissioner of Internal Revenue*, 104 F.2d 474 (4th Cir. 1939) was a

case, like *Labombarde*, where at the time of the conveyance of property from child to parent, there was obviously no intent to repay, extremely limited ability to repay, and no real expectation on the part of the donor that repayment would be made.

These cases follow the premise set down in *Jacob Grossman*, 9 B.T.A. 643 (1927) where the only evidence of the loan from father to son was a letter written at a later date from a dependent son that he would repay every cent he owed his father. The court determined that a debt can only be established by the intent of the parties to create a debt and that ". . . proof of such intention or agreement must consist of acts or declarations substantially contemporaneous with the event." 9 B.T.A. at 645.

An analysis of all of the cases in which an intra-family loan has been held to be "bona fide" reveals that a loan, to be bona fide, need not be "arm's-length"; need not necessarily be evidenced by a note or security; and that a transaction is not converted into something other than a good faith transaction simply because a family member gives more favorable terms to a member of his family than he would have to a stranger. For example, in *Carney v. Benz*, 90 F.2d 747 (1st Cir. 1937), the decedent, in the late 1920's encouraged his wife and daughter to go into the business of commodities trading, and in order to encourage their enterprise, guaranteed their brokerage account. The wife-daughter enterprise was not successful, but decedent's estate was required, pursuant to the guarantee, to pay claims arising from the guarantee. These claims were good faith, enforceable claims, despite the fact that they obviously arose from a situation in which the decedent was attempting to do a favor for his wife and daughter and even though the transaction obviously was not "arm's-length."

*Jones v. United States*, 424 F.Supp. 236 (E.D.Ill.1976) is closely analogous to the present situation. It was discovered after decedent's death that his wife, who had predeceased him, had made a series of loans to decedent over the years for which no

notes had been executed. The only evidence of these loans was found in decedent's regular account book wherein he set down the loans and the token payments thereon, along with all of his other business transactions which the court found were unquestionably valid. The court determined the intra-spousal loans were valid even though no interest had been charged, noting that decedent's wife had a comfortable separate income which enabled her to make such loans. The fact that the other loans noted in decedent's account book had been fully repaid while those to his wife had not was also found not to be decisive in light of the partial payment that had been made by decedent.

*Kerr v. United States*, 199 F.Supp. 447 (E.D.Va.1961) was also a situation where loans were made over a long period of time to the deceased by his sister who had a much larger fortune than had the deceased. Again, the deceased kept an accurate record of these transactions in his regular financial records. Though the district court relied primarily on state law in determining that this constituted a running account, certain factors which urge a finding of a valid debt cannot be overlooked: interest was calculated on the net balance and paid semi-annually; the existence of the loans was known by family and friends of the deceased as well as by his bookkeeper; and the decedent had made expenditures on behalf of his sister which were recorded in his records and credited against the loan balance.

Though a record of advances had also been made in *William Francis Mercil*, 24 T.C. 1150 (1955) the advances were held to be gifts and not loans because the requisite intent to create an indebtedness was not found to exist. The father had paid for the son's education, keeping a record of the sums advanced each year. There was no other written evidence of the indebtedness. Twenty years later when the father was in poor health, the son made payments to the father and sought to deduct them as interest on the previous debt. Of key importance, however, on the issue of intent, was testimony by the father that he would never have enforced payment by the son, and the son's testimony that he would have taken care of his father in any event. In the case at bar, the loans were carried on the account books of both father and sons. The loan from William Elkins was listed as a community asset in his divorce proceedings, and he retained it as his property only after giving assets of comparable value to his wife. This was clearly not a situation where the sons were attempting "to take care of their father" but an advance of cash money to the father to meet a tax payment.

*Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935) teaches that a taxpayer has a legal right to minimize his tax payments by any legal means. In *Gregory* the owner of United Mortgage Company had as his objective the transfer of Monitor Securities Corporation stock from United Mortgage to himself using a shell corporation as the conduit for the transfer. It was held this was a sham and not the type of corporate reorganization intended by the statute because it was "an operation having no business or corporate purpose." In the case at bar, the transaction served serious business purposes. The transfer of the stock was essential to maintain the family's interest in the bank. The loan eased the cash flow problems of an elderly father who faced increasing expenses due to his medical needs, and who was concerned about being on a fixed payment schedule.

Although *Elizabeth N. C. Hetherington*, 20 B.T.A. 806 (1930) involved a debt between a husband and wife, the determinative factor in finding that the advances constituted a debt was that the wife, who had personal wealth from an inheritance, had made previous business loans to her husband, which had been repaid, when she advanced the money then at issue. This prior history of repaid loans served to rebut the presumption that advances made to close family members are gifts because the court found it clear that the loans were made with the intent and expectation they, too, would be repaid.

In *W. F. Young, Inc. v. Commissioner of Internal Revenue*, 120 F.2d 159 (1st Cir. 1941), the taxpayer purchased a failing company, owned by his family, and made advances to it each year in an attempt to keep it operating. The Court found the taxpayer never expected the advances to be repaid and each year filed a bad debt deduction in the same amount as the advance. Because the taxpayer knew the advances would not be repaid and continued to make them, they were determined to be gifts and not loans.

The solvency of the alleged debtor at the time of the advance is significant. In *E. J. Ellisberg*, 9 T.C. 463 (1947), a father executed a bank note on behalf of his son, after the bank refused to extend the son's note, knowing the son to be insolvent. The father made no attempt to collect from the son when the note became due. Though the son filed for bankruptcy, the loan from the father was not listed in the liability schedule and the father filed no claim as a creditor. The court found under those circumstances it was clear that there was no expectation that the advance would be repaid.

Compare the result in *D. W. Pierce*, 41 B.T.A. 1261 (1938) where the son's initial solvency in a similar situation lent credence to the father's testimony that at the time of the advance he fully intended to be repaid, though the son's later financial failure prevented repayment.

■ If repayment of an advance is conditioned upon an event occurring and it never does, then no debt is created. In *Clark v. Commissioner*, 18 T.C. 780 (1952) a husband advanced money to his wife to purchase interest in a newspaper with repayment to be made only if the paper generated enough profit and the dividends enabled payment from a source other than the wife's salary from the paper. The paper failed and the husband attempted to take a bad debt deduction for the amount of the advance. Because the contingency upon which repayment was based never occurred, there was no legal obligation for repayment which could be enforced and therefore no debt

existed. It is obvious in the case at bar that at some point in time, either before or after Elkins, Sr.'s death, that sufficient assets and cash would exist to pay the indebtedness.

*Estate of Ava Ribblesdale*, 24 T.C.M. 1041 (1964) involved circumstances which are very similar to the case at bar. The decedent had been the wife of John Jacob Astor but had divorced him before his death in the Titanic disaster. The decedent and her son, who had inherited his father's fortune, entered into various agreements by which he gave her funds. During 1932–34, he made gifts of over $350,000 to her. Tiring of his mother's constant requests for funds, a new agreement was executed in 1941 by which the son would advance money to the former Mrs. Astor for which she would give a promissory note in return. Under the agreement these notes could be repaid at any time during the decedent's lifetime or would be paid by her estate. The value of decedent's estate was over $3 million, and the total of the advances equaled $722,500. The Court, in finding the loans bona fide, relied heavily on the adherence of the parties to the terms of the agreement as drafted, with the son only making the advances with the expectation that they would be repaid. The court was not persuaded otherwise by the prior gifts from son to mother made under different circumstances.

■ The United States here seems to argue that Elkins, Sr. did not "need" to borrow money from his sons. This is not persuasive because Elkins, Sr. stayed fully invested and in his own mind undoubtedly believed he did "need" to borrow. In *Ribblesdale*, the court said:

While there is some question as to whether she did actually 'need' this money, the record before us indicates that she believed that her expenditures were such that these borrowings were advisable. Since the record indicates to us that she intended to have her estate repay these amounts, it is not for us to say that she could have financed her expenditures by invading the corpus of her custodial account and that therefore the continued

borrowings show that the advances were not bona fide loans.

*Supra* at 1044. Accordingly, since Elkins, Sr. intended his estate to repay the loans (see Clause 65 of will), and the sons expected to receive repayment, whether Elkins, Sr. preferred to borrow the money rather than risk a high capital gains tax by selling some of the bank stock, is immaterial. In addition, there were understandable reasons to retain the bank stock. Control of a bank or influence created by substantial stock ownership is obviously important.

In *Estate of Akos Anthony Horvath*, 59 T.C. 551 (1973) decedent and his sons owned a closely held corporation from which all three made cash withdrawals. Decedent had written a letter to auditors evidencing his debts to the corporation. Decedent had also included a provision in his will that his stock in the corporation was to be used to repay his debt. Under New York law, the written acknowledgement by decedent of his debt sent to the auditors was sufficient to toll the running of the statute of limitations. This was clearly not an "arm's-length" transaction between adversary parties. Though *Horvath* involved a closely held corporation and not an intra-family transaction, the Fifth Circuit in *Tulia Feedlot, Inc. v. United States*, 513 F.2d 800 (1975) recognized that the two were similar in effect. Therefore, in the case at bar, the fact that the Elkins sons negotiated a less stringent agreement with their father than they might with a stranger, will not defeat a finding that a true debt existed.

In *Buck v. Helvering*, 73 F.2d 760 (9th Cir. 1934) a wife advanced $95,000 to her husband to pay a judgment rendered against him so as to avoid a sale of assets. There was no written evidence of the loan, but under California law there is a presumption of debt when a wife advances money to her husband. Though the testimony of the wife used both the words "gave" and "loaned," the court found the evidence was insufficient to rebut the statutory presumption and that the wife had a legally enforceable claim. The fact that the wife did not file a claim against her husband's estate was not found determinative by the Court in view of the fact that as a beneficiary under the law the wife took an amount of the estate exceeding that of her claim. In the case at bar, it could be inferred, and the Court does infer, that it was Elkins, Sr.'s reluctance to sell stock and securities to pay the gift tax that induced him to obtain the loans from his sons.

In *United States v. Stapf*, 375 U.S. 118, 84 S.Ct. 248, 11 L.Ed.2d 195 (1963) a widow elected to take under the will of her deceased husband rather than accept her one-half share of the community property. Under the terms of the will, the decedent directed his executors to pay all of the community debts and not just the one-half of the debts allowed under Texas statutes. The Court upheld the Commissioner in disallowing as a claim against the estate the entire amount of the community debts, finding that the direction to the executors to pay the debts of another was merely the making of a beneficial gift to his wife. The personal obligation of the decedent existed only to one-half of the debts, and this was the extent of a claim against his estate. In the case at bar, Elkins, Sr. directed his executors to repay all debts owed to his sons. These debts constituted a personal obligation of the senior Elkins to his sons and were legally enforceable; thus, this was not an attempt to make beneficial gifts to his sons.

For the reasons stated above, judgment should be entered for the plaintiffs. Counsel for plaintiffs will submit an appropriate form of judgment within five (5) days.