ESTATE OF DANIEL LEAVITT, DECEASED, CHARLES D. FOX III, EXECUTOR, AND ESTATE OF EVELYN M. LEAVITT, DECEASED, CHARLES D. FOX III, EXECUTOR, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 32041-84, 36453-84,    Filed February 10, 1988.
36454-84, 36455-84.

---

[1]Cases of the following petitioners are consolidated herewith: Anthony D. and Marjorie F. Cuzzocrea, docket No. 36453-84; Valley Pathology Associates, Inc., docket No. 36454-84; and Estate of Wolfgang A. Wirth, Deceased, Dominion Trust Co., Executor, and Verla J. Wirth, docket No. 36455-84.

*Dianne E. H. Wilcox,* for the petitioners.
*Stephen M. Friedberg,* for the respondent.

## OPINION

NIMS, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax as follows:

| Docket No. | Tax year ended— | Deficiency |
|---|---|---|
| 32041-84 | Dec. 31, 1979 | $4,767.77 |
| | Dec. 31, 1980 | 1,577.06 |
| 36453-84 | Dec. 31, 1979 | 3,031.29 |
| | Dec. 31, 1980 | 16,472.46 |
| | Dec. 31, 1981 | 13,919.88 |
| 36454-84 | June 30, 1980 | 901.00 |
| | June 30, 1981 | 1,041.00 |
| | June 30, 1982 | 1,252.00 |
| 36455-84 | Dec. 31, 1979 | 1,320.98 |
| | Dec. 31, 1980 | 1,495.88 |
| | Dec. 31, 1981 | 2,298.86 |

These cases were consolidated for trial, briefing, and opinion pursuant to Rule 141(a).[2] After concessions and stipulations,[3] the only issue for decision is whether a shareholder's guarantee of the debt of an electing small

---

[2]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure. All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

[3]The parties stipulated that this Court's resolution of the issues presented in *Estate of Anthony Gacek, Deceased, Charles D. Fox, III, Executor, et al. v. Commissioner of Internal Revenue,* docket Nos. 17890-81, 17891-81, 17892-81, 17893-81, 10059-82, 10060-82, 10061-82, 10062-82, and 458-84, will control several of the issues in these consolidated cases. Since the time of the parties' agreement, those issues have been decided. See *Estate of Gacek v. Commissioner,* T.C. Memo. 1987-349. After further concessions by the parties, no issues remain with respect to docket Nos. 36454-84 and 36455-84 or the 1980 year in docket No. 32041-84.

business corporation under subchapter S of the Internal Revenue Code increases the shareholder's basis in his stock in the corporation.

All the facts have been stipulated. The stipulations of fact and attached exhibits are incorporated herein by this reference.

At the time the petitions in these cases were filed, Charles D. Fox III, Anthony D. Cuzzocrea, and Marjorie F. Cuzzocrea resided in Roanoke, Virginia.[4] Daniel and Evelyn Leavitt, whose estates are petitioners in docket No. 32041-84, filed a joint Federal income tax return for the taxable year 1979.[5] Anthony D. Cuzzocrea and Marjorie F. Cuzzocrea filed joint Federal income tax returns for the taxable years 1979, 1980, and 1981.

VAFLA Corp. (hereinafter referred to as the corporation), was an electing small business corporation under subchapter S during the years in issue and was incorporated in February 1979, to acquire and operate the Six-Gun Territory Amusement Park near Tampa, Florida. The initial issue of the corporation's capital stock took place in March 1979, and consisted of 100,000 shares. Daniel Leavitt and Anthony D. Cuzzocrea each paid $10,000 cash for their shares on or before September 30, 1979.

The first taxable year of the corporation consisted of 7 months and ended on September 30, 1979. As of September 30, 1979, the corporation had suffered a net operating loss of $265,566.47 and had a retained earnings deficit of $345,370.20. During its second taxable year ending September 30, 1980, the corporation suffered a net operating loss of $482,181.22 and had a retained earnings deficit of $1,093,383.56. During its third taxable year ending September 30, 1981, the corporation suffered a net operating loss of $475,175.70 and had a retained earnings deficit of $1,908,680.22.

From August 2, 1979, through August 27, 1979, Anthony D. Cuzzocrea and Daniel Leavitt, as well as other sharehold-

---

[4]At the time the petitions in docket Nos. 36454-84 and 36455-84 were filed, Verla J. Wirth resided in Salem, Virginia, and Valley Pathology Associates, Inc., and Dominion Trust Co. had their principal offices in Roanoke, Virginia. However, no issues remain for consideration in docket Nos. 36454-84 and 36455-84. See note 3 supra.

[5]Evelyn M. Leavitt, on behalf of herself and her deceased husband, filed a joint Federal income tax return for 1980. However, no issues relating to this return are before the Court. See note 3 supra.

ers, signed guarantee agreements whereby each agreed to be jointly and severally liable for all indebtedness of the corporation to the Bank of Virginia. All the guarantees to the Bank of Virginia were unlimited except the guarantee of Anthony D. Cuzzocrea which was limited to $300,000.

The corporation borrowed $300,000 from the Bank of Virginia for which it issued a promissory note to the bank dated September 12, 1979. The purpose of the loan was to fund VAFLA's existing and anticipated operating deficits.

At the time the loan was made, the corporation's liabilities exceeded its assets, and the corporation had so little available cash that it could not meet its cash-flow requirements. Virtually all of the corporation's assets were encumbered as collateral for a purchase money indebtedness of approximately $1 million to National Service Industries, Inc. In processing the loan, the Bank of Virginia was provided a statement of income for the corporation for its first 3 months of operation during which the corporation experienced a loss of $142,410.16, resulting in a negative net worth of $82,410.16 as of May 31, 1979.

Seven of the corporation's shareholders agreed to guarantee the $300,000 loan personally. According to the financial statements submitted to the bank, these shareholders had an aggregate net worth of $3,407,286 and immediate liquidity (cash and securities) of $382,542. The loan was approved only because of the financial strength of the guarantors.

The Bank of Virginia loan was consistently shown on the corporation's financial statements and tax returns for its fiscal years ending 1979, 1980, and 1981, as a loan from shareholders. However, during those years, the corporation made the following principal payments to the Bank of Virginia:

| | |
|---|---:|
| Dec. 26, 1979 | $10,000 |
| July 15, 1980 | 10,000 |
| Jan. 6, 1981 | 10,000 |

All interest payments were also made by the corporation. None of the payments by the corporation on the principal or the interest of the loan were reported by the corporation or petitioners as constructive dividends.

Daniel and Evelyn M. Leavitt deducted a loss of $13,808 attributable to the corporation on their 1979 joint Federal income tax return. Respondent disallowed $3,808 of this deduction. Anthony D. and Marjorie F. Cuzzocrea deducted losses of $13,808, $29,921, and $22,746 attributable to the corporation on their 1979, 1980, and 1981 joint Federal income tax returns, respectively. Respondent disallowed all of these deductions in excess of $10,000.

Respondent takes the position that shareholders Daniel Leavitt and Anthony D. Cuzzocrea may not deduct losses attributable to the corporation in excess of their initial basis in their shares of the corporation. Petitioners maintain that their guarantees of the $300,000 loan to the corporation from the Bank of Virginia increased their basis in their stock sufficiently to allow deductions for their proportionate shares of losses attributable to the corporation during the years in issue.

Former section 1374,[6] as in effect during the years in

---

[6]Former sec. 1374 as in effect during the years in issue provided:

SEC. 1374. CORPORATION NET OPERATING LOSS ALLOWED TO SHAREHOLDERS.

(a) GENERAL RULE.—A net operating loss of an electing small business corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation in the manner and to the extent set forth in this section.

(b) ALLOWANCE OF DEDUCTION.—Each person who is a shareholder of an electing small business corporation at any time during a taxable year of the corporation in which it has a net operating loss shall be allowed as a deduction from gross income, for his taxable year in which or with which the taxable year of the corporation ends (or for the final taxable year of a shareholder who dies before the end of the corporation's taxable year), an amount equal to his portion of the corporation's net operating loss (as determined under subsection (c)). The deduction allowed by this subsection shall, for purposes of this chapter, be considered as a deduction attributable to a trade or business carried on by the shareholder.

(c) DETERMINATION OF SHAREHOLDER'S PORTION.—

(1) IN GENERAL.—For purposes of this section, a shareholder's portion of the net operating loss of an electing small business corporation is his pro rata share of the corporation's net operating loss (computed as provided in section 172(c), except that the deductions provided in part VIII (except section 248) of subchapter B shall not be allowed) for his taxable year in which or with which the taxable year of the corporation ends. For purposes of this paragraph, a shareholder's pro rata share of the corporation's net operating loss is the sum of the portions of the corporation's daily net operating loss attributable on a pro rata basis to the shares held by him on each day of the taxable year. For purposes of the preceding sentence, the corporation's daily net operating loss is the corporation's net operating loss divided by the number of days in the taxable year.

(2) LIMITATION.—A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of—

(A) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable year of the corporation (or, in respect of stock sold or otherwise disposed of during such taxable year, as of the day before the day of such sale or other disposition), and

issue, permitted a shareholder in a subchapter S corporation to deduct his portion of the corporation's net operating loss from his gross income. Former section 1374(c) limited the amount of the deduction to the sum of (1) the adjusted basis of the shareholder's stock in the corporation and (2) the adjusted basis of any indebtedness of the corporation to the shareholder.

The corporation sustained losses for the taxable years 1979, 1980, and 1981. Before the guarantee transaction, petitioners Daniel Leavitt and Anthony D. Cuzzocrea each had an adjusted basis in their stock in the corporation of $10,000. We must determine whether petitioners' guarantee of the $300,000 loan from the Bank of Virginia to the corporation increased the basis in petitioners' stock in the corporation.

It is well settled that:

the fact that shareholders may be primarily liable on indebtedness of a corporation to a third party does not mean that this indebtedness is "indebtedness of the corporation to the shareholder" within the meaning of section 1374(c)(2)(B). No form of indirect borrowing, be it guaranty, surety, accommodation, comaking or otherwise, gives rise to indebtedness from the corporation to the shareholders until and unless the shareholders pay part or all of the obligation. * * * [*Raynor v. Commissioner*, 50 T.C. 762, 770-771 (1968).]

See also *Putnam v. Commissioner*, 352 U.S. 82 (1956); *Underwood v. Commissioner*, 535 F.2d 309 (5th Cir. 1976), affg. 63 T.C. 468 (1975); *Perry v. Commissioner*, 47 T.C. 159, affd. 392 F.2d 458 (8th Cir. 1968); *Wheat v. United States*, 353 F. Supp. 720 (S.D. Tex., 1973); *Neal v. United States*, 313 F. Supp. 393 (C.D. Cal. 1970).

---

(B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation (or, if the shareholder is not a shareholder as of the close of such taxable year, as of the close of the last day in such taxable year on which the shareholder was a shareholder in the corporation).

In 1982, Congress revised the rules pertaining to subch. S corporations in the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669. The revisions in the 1982 Act do not apply in this case, however, because they apply only to taxable years beginning after Dec. 31, 1982. Sec. 6(a), Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, 1697 (1982). The taxable years in this case are 1979, 1980, and 1981.

We note, however, that the limitations provided in former sec. 1374(c)(2) were reenacted by sec. 2 of the Subchapter S Revision Act of 1982 in sec. 1366(d)(1). Sec. 1366(d)(1) is currently in effect.

In the instant case, petitioners have never been called upon to pay any of the loan that they guaranteed. Accordingly, the guarantees that petitioners executed do not increase any indebtedness of the corporation to them.

Nevertheless, petitioners ask us to view the guarantee transactions as constructive loans from the banks to petitioners and, in turn, contributions of those same funds by petitioners to the capital of the corporation. In other words, petitioners contend that their guarantees of the $300,000 loan from the Bank of Virginia to the corporation should increase their basis in the stock of the corporation. We disagree.

Under former section 1374(c)(2) corporate debts to third parties guaranteed by the shareholder, whether collateralized or not, do not lead to an increase in the shareholder's basis in his subchapter S corporation stock. To increase the basis in the stock of a subchapter S corporation, there must be an economic outlay or a realization of income on the part of the shareholder. *Brown v. Commissioner,* 706 F.2d 755 (6th Cir. 1983), affg. T.C. Memo. 1981-608; *Calcutt v. Commissioner,* 84 T.C. 716, 720 (1985).

The term "basis," for purposes of section 1374(c), is defined in section 1012.[7] *Borg v. Commissioner,* 50 T.C. 257, 263 (1968). Section 1012 provides the general rule that the "basis of property shall be the cost of such property." Section 1.1012-1(a), Income Tax Regs., defines "cost" to mean the "amount paid" for property "in cash or other property." Because petitioners' guarantees in this case do not constitute cash or other property, they cannot be included in the basis of petitioners' stock in the corporation.

In *Borg v. Commissioner, supra,* an electing small business corporation owed one of its shareholders unpaid salary for his performance of services as evidenced by notes from the corporation to the shareholder. The shareholder did not report any part of the unpaid salary as income in his returns. The shareholder in *Borg* argued that the notes for

---

[7]Sec. 1012 provides:

The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer.

the unpaid salary increased his basis in the indebtedness of the corporation to him. We held that because the shareholder had incurred no cost in connection with the notes, he had no basis in the notes and therefore there was no addition to the adjusted basis of the indebtedness of the corporation to the shareholder. We explained:

cost for the purposes of the Code ordinarily means cost to the taxpayer. *Detroit Edison Co. v. Commissioner*, 319 U.S. 98 (1943). Where a taxpayer has not previously reported, recognized, or even *realized* income, it cannot be said that he has a basis for a note evidencing his right to receive such income at some time in the future. That petitioner Joe E. Borg performed valuable services for Borg Steel is undeniable; however, the performance of services, involving neither the realization of taxable income nor a capital outlay, is not the kind of cost that would be shown in a cash receipts and disbursements system of income accounting. See, e.g., *Pounds v. United States*, 372 F.2d 342, 351-352 (C.A. 5, 1967); *Alsop v. Commissioner*, 290 F.2d 726 (C.A. 2, 1961), affirming on other grounds 34 T.C. 606 (1960); *Ernest W. Brown, Inc.*, 28 T.C. 682 (1957), affirmed per curiam 258 F.2d 829 (C.A. 2, 1958). Since the services performed by petitioner Joe E. Borg had no cost within the meaning of section 1012, his notes for unpaid salary had a basis of zero and, therefore, added nothing to the adjusted basis for indebtedness for the purpose of computing the section 1374(c)(2) limitation on net operating loss deductions. [*Borg v. Commissioner*, 50 T.C. at 263; emphasis in original.]

In this case, petitioners' guarantees did not require any capital outlay on their part during the years in issue. Without capital outlay or a realization of income, as required by *Borg*, petitioners cannot increase their adjusted basis in their stock in the corporation. Nor can it of course be said that the guarantees in question were corporate debt obligations to petitioners which acquired a basis resulting from any capital outlays by petitioners. Petitioners ask, however, that we ignore the form of the transaction, i.e., a loan from the Bank of Virginia to the corporation that was guaranteed by its shareholders, and find that the bank actually loaned the money to the shareholder-guarantors who then advanced the proceeds of the loan as a contribution to the capital of the corporation. We decline to adopt petitioners' view of the transaction.

The Bank of Virginia loaned the money to the corporation and not to petitioners. The proceeds of the loan were to be used in the operation of the corporation's business. Petitioners submitted no evidence that they were free to dispose of

the proceeds of the loan as they wished. Nor were the payments on the loan reported as constructive dividends on the corporation's Federal income tax returns or on petitioners' Federal income tax returns during the years in issue. Accordingly, we find that the transaction was in fact a loan by the bank to the corporation guaranteed by the shareholders.

Nevertheless, petitioners ask that we apply traditional debt-equity principles[8] in determining the nature of the

---

[8]The debt-equity analysis usually is applied to guaranteed debts in cases involving subch. C corporations in which respondent argues that advances made in the form of a guaranteed debt are in substance capital contributions. See, e.g., *John Kelly Co. v. Commissioner,* 326 U.S. 521 (1946); *Casco Bank & Trust Co. v. United States,* 544 F.2d 528 (1st Cir. 1976); *Plantation Patterns, Inc. v. Commissioner,* 462 F.2d 712 (5th Cir. 1972), affg. T.C. Memo. 1970-182; *Murphy Logging Co. v. United States,* 378 F.2d 222 (9th Cir. 1967); *Smyers v. Commissioner,* 57 T.C. 189 (1971); *Santa Anita Consolidated, Inc. v. Commissioner,* 50 T.C. 536 (1968); *Kavich v. United States,* 507 F. Supp. 1339 (D. Neb. 1981). The courts generally consider the following factors in determining whether a debt transaction should be regarded as a contribution to equity:

"(1) The names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) 'thin' or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of 'dividend' money; (11) the ability of the corporation to obtain loans from outside lending institutions. [*Plantation Patterns, Inc. v. Commissioner,* 462 F.2d at 718-719, quoting *Montclair, Inc. v. Commissioner,* 318 F.2d 38, 40 (5th Cir. 1972). Fn. ref. omitted.]"

*O.H. Kruse Grain & Milling v. Commissioner,* 279 F.2d 123, 125-126 (9th Cir. 1960), affg. a Memorandum Opinion of this Court.

In addition, courts take into consideration factors such as the extent to which the advance was used to acquire capital assets and the failure of the debtor to repay on the due date or to seek a postponement. *In re Lane,* 742 F.2d 1311, 1315 (11th Cir. 1984); *Estate of Mixon v. United States,* 464 F.2d 394, 402 (5th Cir. 1972); *Fin Hay Realty Co. v. United States,* 398 F.2d 694, 696 (3d Cir. 1968).

See also sec. 385, which provides as follows:

SEC. 385. TREATMENT OF CERTAIN INTERESTS IN CORPORATIONS AS STOCK OR INDEBTEDNESS.

(a) AUTHORITY TO PRESCRIBE REGULATIONS.—The Secretary is authorized to prescribe such regulations as may be necessary or appropriate to determine whether an interest in a corporation is to be treated for purposes of this title as stock or indebtedness.

(b) FACTORS.—The regulations prescribed under this section shall set forth factors which are to be taken into account in determining with respect to a particular factual situation whether a debtor-creditor relationship exists or a corporation-shareholder relationship exists. The factors so set forth in the regulations may include among other factors:

(1) whether there is a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth, and to pay a fixed rate of interest,

(2) whether there is subordination to or preference over any indebtedness of the corporation,

(3) the ratio of debt to equity of the corporation,

(4) whether there is convertibility into the stock of the corporation, and

transaction in this case. Petitioners maintain that because the corporation was insolvent at the time the loan was made and because the bank would not have advanced the funds to the corporation without the shareholders' guarantees, the loan was in fact a loan from the bank to the shareholders who then advanced the proceeds of the loan as a contribution to the capital of the corporation. We decline to adopt traditional debt-equity principles in this case.

Petitioners' reliance on *Blum v. Commissioner,* 59 T.C. 436 (1972), is misplaced. In *Blum* the taxpayer, a shareholder in an electing small business corporation under subchapter S, also asked us to apply traditional debt-equity principles and treat his guarantee of a loan from a bank to the corporation as an indirect capital contribution. We declined to decide the issue as to the applicability of debt-equity principles because the taxpayer had failed his burden of proving that the bank in substance had loaned the funds to the taxpayer and not to the corporation. *Blum v. Commissioner,* 59 T.C. at 439 n. 4.

Petitioners' reliance on *In re Breit,* 460 F. Supp. 873 (E.D. Va. 1978), is also misplaced. The facts in *Breit* were similar to the facts in *Blum.* The taxpayers in *Breit* raised the same argument as was raised in *Blum* that their guarantees of loans from a bank to their subchapter S corporation were actually loans from the bank to the shareholders and, in turn, contributions by the shareholders to the capital of the corporation. The court held in *Breit,* as in *Blum,* that the taxpayer-shareholders had failed their burden of proving that the loans that they had guaranteed were advanced to them rather than to the corporation. The court also considered and rejected various other variations on this theme, e.g., that the subchapter S corporation was the shareholder's alter ego, also intended to show that the bank loans were actually made to the shareholder.

---

(5) the relationship between holdings of stock in the corporation and holdings of the interest in question.

Congress enacted sec. 385 in the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, 613. Proposed regulations under this section had been issued but were withdrawn in 1983. T.D. 7920, 1983-2 C.B. 69. At the present time there are no regulations implementing the provisions of sec. 385.

In making the debt-equity determination, the Court must decide each case on its own facts, and no one standard is controlling. *Plantation Patterns, Inc. v. Commissioner, supra; Santa Anita Consolidated, Inc. v. Commissioner, supra.*

In *Selfe v. United States*, 778 F.2d 769 (11th Cir. 1985), the 11th Circuit applied a debt-equity analysis and held that a shareholder's guarantee of a loan made to a subchapter S corporation may be treated for tax purposes as an equity investment in the corporation where the lender looks to the shareholder as the primary obligor. We respectfully disagree with the 11th Circuit and hold that a shareholder's guarantee of a loan to a subchapter S corporation may not be treated as an equity investment in the corporation absent an economic outlay by the shareholder.

The *Selfe* opinion was based primarily on *Plantation Patterns, Inc. v. Commissioner*, 462 F.2d 712 (5th Cir. 1972), affg. T.C. Memo. 1970-182, in which the Fifth Circuit affirmed as not clearly erroneous a finding by this Court that a transaction structured as a loan by an independent third party to a corporation, and guaranteed by a shareholder, was in substance a loan to the shareholder followed by his contribution of the loan proceeds to the corporation, and that as a result the corporation's payments of principal and interest on the debt constituted constructive dividends to the shareholder.

However, the corporation in *Plantation Patterns* was a subchapter C corporation. We decline to apply the debt-equity analysis used in *Plantation Patterns* to the guarantee of a loan to a subchapter S corporation. Congress has promulgated a set of rules designed to limit the amount of deductions allowable to a shareholder of a subchapter S corporation to the amount he has actually invested in the corporation and the amounts of income from the corporation included in the shareholder's gross income. See former secs. 1374(c) and 1376.[9] The report of the Committee on Finance

---

[9]Former sec. 1376, as in effect during the years in issue, provided:

SEC. 1376. ADJUSTMENTS TO BASIS OF STOCK OF, AND INDEBTEDNESS OWING, SHAREHOLDERS.

(a) INCREASE IN BASIS OF STOCK FOR AMOUNTS TREATED AS DIVIDENDS.—The basis of a shareholder's stock in an electing small business corporation shall be increased by the amount required to be included in the gross income of such shareholder under section 1373(b), but only to the extent to which such amount is included in his gross income in his return, increased or decreased by any adjustment of such amount in any redetermination of the shareholder's tax liability.

(b) REDUCTION IN BASIS OF STOCK AND INDEBTEDNESS FOR SHAREHOLDER'S PORTION OF CORPORATION NET OPERATING LOSS.—

(1) REDUCTION IN BASIS OF STOCK.—The basis of a shareholder's stock in an electing small business corporation shall be reduced (but not below zero) by an amount equal to the

of the Senate underscores Congress' purpose as follows:

> The amount of the net operating loss apportioned to any shareholder pursuant to the above rule is limited under section 1374(c)(2) to the adjusted basis of the shareholder's *investment* in the corporation; that is, to the adjusted basis of the stock in the corporation owned by the shareholder and the adjusted basis of any indebtedness of the corporation to the shareholder. * * * [S. Rept. 1983, 85th Cong., 2d Sess. (1958), 1958-3 C.B. 1141. Emphasis added.]

As we construed this language in *Perry v. Commissioner*, 54 T.C. 1293, 1296 (1970), the use of the word "investment" reveals an intent, on the part of the committees, to limit the applicability of section 1374(c)(2) to the actual economic outlay of the shareholder in question. See also *Pike v. Commissioner*, 78 T.C. 822, 839-840 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). To allow petitioners to increase the basis of their stock without a capital outlay or a realization of income would provide them a means of avoiding these limitations. See also *Brown v. Commissioner*, 706 F.2d at 756 (absent an economic outlay requirement for obtaining an increase in basis, subchapter S shareholders could readily skirt the limitation embodied in section 1374(c) and thereby erect a tax shelter that Congress never intended to create).

In *Selfe,* the court also relied on *In re Lane,* 742 F.2d 1311 (11th Cir. 1984), in which the 11th Circuit applied a debt-equity analysis and held that funds advanced to a subchapter S corporation by a shareholder and payments made by the shareholder as guarantor of corporate obligations to institutional lenders were capital contributions rather than loans from the shareholder to the corporation. In *Lane,* the shareholder had actually paid the amounts he had guaranteed and, therefore, the amounts he paid could

---

amount of his portion of the corporation's net operating loss for any taxable year attributable to such stock (as determined under section 1374(c)).

(2) REDUCTION IN BASIS OF INDEBTEDNESS.—The basis of any indebtedness of an electing small business corporation to a shareholder of such corporation shall be reduced (but not below zero) by an amount equal to the amount of the shareholder's portion of the corporation's net operating loss for any taxable year (as determined under section 1374(c)), but only to the extent that such amount exceeds the adjusted basis of the stock of such corporation held by the shareholder.

In 1982, Congress revised the rules pertaining to subch. S corporations in the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669. The provisions of the revising act apply to the taxable years beginning after Dec. 31, 1982, and therefore do not apply in this case. See note 6 *supra.*

be considered a contribution to capital. In this case, petitioners have not paid any of the loans they guaranteed and, therefore, have contributed nothing to the capital of the corporation.

Petitioners' reliance on section 1.385-9, Proposed Income Tax Regs., is also misplaced. The proposed regulation was withdrawn in 1983. T.D. 7920, 1983-2 C.B. 69. Proposed regulations are only preliminary proposals; they are not binding on respondent or on the Court. *Garvey, Inc. v. United States*, 1 Cl. Ct. 108 (1983), affd. 726 F.2d 1569 (Fed. Cir. 1984). Moreover, section 1.385-9, Proposed Income Tax Regs., was drafted in connection with section 385, which is a part of subchapter C of the Internal Revenue Code. Because we hold that the debt-equity analysis does not apply to guaranteed loans to subchapter S corporations for which the shareholder has incurred no cost, the proposed regulation is not relevant in this case.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, CHABOT, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, JACOBS, GERBER, WRIGHT, PARR, WELLS, and RUWE, *JJ.,* agree with the majority opinion.

SWIFT and WHALEN, *JJ.,* concur in the result only.

---

WILLIAMS, *J.* concurring: I agree with the result of the majority opinion and concur that petitioners should be stuck with the form of the transaction they chose. The majority opinion, however, unnecessarily rejects the reasoning of *Selfe v. United States,* 778 F.2d 769 (11th Cir. 1985). *Selfe* involved a sole shareholder's guarantee, and because the bank looked to that shareholder for repayment, the form of the transaction had no tax significance. The shareholder could be properly viewed as in effect contributing the proceeds of the loan to the corporation.

Unlike *Selfe,* this case involves a guarantee by multiple shareholders. In the case of the sole shareholder's guarantee of a loan to his financially strapped corporation, no doubt

exists about to whom the bank is really looking for repayment of the loan. In the case of multiple shareholders' guarantees, however, doubt about who is liable on the loan persists, except to the extent that payments are made on the loan. In this case, even if petitioners have shown that the bank looked to them as a group, no rationale exists for allocating the proceeds of the loan as deemed contributions to capital among the shareholders. Each is jointly and severally liable for the amount of the loan (except for Mr. Cuzzocrea whose liability is capped at $300,000). As a result of this ambiguous liability, if a shareholder's basis in his stock turns on to whom the bank looks for repayment, each shareholder could rightly claim to have contributed the entire proceeds of the loan because each shareholder could have properly argued that the bank could look only to him for repayment. The result of such claims would be an unwarranted multiplication of basis which is contrary to the purpose and intent of sections 1012 and 1374 and which violates the integrity of the tax law. This unwarranted multiplication of basis cannot occur for a sole shareholder's guarantee.

I believe there are circumstances, limited to cases involving the sole shareholder, where the *Selfe* rationale can be correctly applied. We do not need to reject *Selfe* in this case, and I view the majority's attempt to do so as dicta.

---

FAY, *J.*, dissenting: The majority opinion holds that petitioners' guarantees do not increase the amount of their section 1374(c)(2) limitations. The majority opinion errs by not recognizing the applicability of traditional debt-equity principles in determining the Federal tax effect of petitioners' guarantees and by not recognizing the existence and presence of the type of economic outlay proven by petitioners. Before addressing these errors, I will first discuss the distinctions between section 1374(c)(2)(A) and section 1374(c)(2)(B), distinctions which the majority does not fully address.

The portion of the net operating loss of an electing small business corporation which may be deducted by a shareholder is limited to the sum of the amount determined in

section 1374(c)(2)(A) and the amount determined in section 1374(c)(2)(B). Section 1374(c)(2)(A) pertains to the adjusted basis in stock of the electing small business corporation. Section 1374(c)(2)(B) pertains to the adjusted basis of any indebtedness of the electing small business corporation to the shareholder.

Though petitioners clearly and specifically argue that section 1374(c)(2)(B) is not applicable here, the majority opinion begins its legal analysis by quoting from *Raynor v. Commissioner,* 50 T.C. 762, 770-771 (1968):

No form of indirect borrowing, be it guaranty, surety, accommodation, comaking or otherwise, gives rise to *indebtedness from the corporation to the shareholders* until and unless the shareholders pay part or all of the obligation. [50 T.C. at 770-771. Emphasis added.]

Majority opinion at p. 211. I fully agree with this settled statement of the law, but view it as irrelevant to the issue presented. Petitioners are not arguing that their guarantees increased the amount of "any indebtedness of the corporation to the shareholder," as used in section 1374(c)(2)(B) and interpreted in *Raynor v. Commissioner, supra.* Rather, petitioners contend that since the Bank of Virginia looked primarily to petitioners and the other shareholder/guarantors, not VAFLA, for repayment of the $300,000, in substance petitioners and the other shareholder/guarantors borrowed the $300,000 from the Bank of Virginia and made a capital contribution of such amount to VAFLA. Accordingly, petitioners are arguing that they are entitled to an increase in their "adjusted basis * * * of the shareholder's stock in the electing small business corporation" as used in section 1374(c)(2)(A).

That the majority did not recognize the distinctions between section 1374(c)(2)(A) and section 1374(c)(2)(B) is illustrated by the majority's quote from *Borg v. Commissioner,* 50 T.C. 257, 263 (1968), and the conclusion drawn therefrom. The majority opinion quotes a passage from *Borg,* the final sentence of which is:

Since the services performed by petitioner Joe E. Borg had no cost within the meaning of section 1012, his notes for unpaid salary had a basis of zero and, therefore, added nothing to the *adjusted basis for indebtedness* for the purpose of computing the section 1374(c)(2) limitation on net operating loss deductions, [50 T.C. at 263. Emphasis added.]

Majority opinion at p. 213. From this quote, which is no more relevant to the issue presented than the quote from *Raynor v. Commissioner, supra,* the majority makes the quantum leap without explanation, to the conclusion that:

Without capital outlay or a realization of income, as required by *Borg,* petitioners cannot increase their *adjusted basis in their stock in the corporation.* [Majority opinion at p. 213. Emphasis added.]

The majority, by not recognizing the distinctions between section 1374(c)(2)(A) and section 1374(c)(2)(B), was prevented from weeding out irrelevant cases and properly focusing on the issue presented. Further, petitioners herein have recognized, as has this Court, that shareholder-guaranteed corporate debt cannot be characterized as an indebtedness of the corporation to the shareholder.[1] I will now address the errors of the majority opinion.

I. *Debt-equity principles are applicable in determining whether a shareholder-guaranteed corporate debt should be characterized as a capital contribution.*

That a shareholder-guaranteed corporate debt can be characterized for Federal tax purposes as a capital contribution is hardly a novel legal theory. This legal theory has been considered in at least 20 opinions.[2] Almost invariably,

---

[1]As will be seen below, whether a shareholder-guaranteed corporate debt is in substance a shareholder debt turns on whether an analysis of traditional debt-equity factors reveals the presence of more equity than debt factors. Where more equity factors are present, the shareholder-guaranteed corporate debt is characterized as shareholder debt. The deemed advance of the loan proceeds from the shareholder to the corporation must, of course, be characterized as a capital contribution, rather than a loan, because more equity than debt factors are present. As a capital contribution, the shareholder receives an increase in the basis of stock (see sec. 1374(c)(2)(A)), and not an increase in any indebtedness of the corporation to the shareholder (see sec. 1374(c)(2)(B)). See also *Bader v. Commissioner,* T.C. Memo. 1987-30.

[2]See *Blum v. Commissioner,* 59 T.C. 436, 439-440 (1972); *Smyers v. Commissioner,* 57 T.C. 189, 198 (1971); *Santa Anita Consolidated, Inc. v. Commissioner,* 50 T.C. 536, 550 (1968); *J.A. Maurer, Inc. v. Commissioner,* 30 T.C. 1273, 1290 n. 2 (1958); *Schneiderman v. Commissioner,* T.C. Memo. 1987-551; *Gurda v. Commissioner,* T.C. Memo. 1987-394; *Bader v. Commissioner,* T.C. Memo. 1987-30; *Blackman v. Commissioner,* T.C. Memo. 1981-244; *Albert v. Commissioner,* T.C. Memo. 1980-567; *LaStaiti v. Commissioner,* T.C. Memo. 1980-547; *Selfe v. United States,* 778 F.2d 769, 774 (11th Cir. 1985); *In re Lane,* 742 F.2d 1311, 1319-1320 (11th Cir. 1984); *Casco Bank & Trust Co. v. United States,* 544 F.2d 528, 534-535 (1st Cir. 1976); *Plantation Patterns, Inc. v. Commissioner,* 462 F.2d 712, 722-724 (5th Cir. 1972), affg. T.C. Memo. 1970-182; *Murphy Logging Co. v. United States,* 378 F.2d 222, 224 (9th Cir. 1967); *Kavich v. United States,* 507 F. Supp. 1339, 1342 (D. Neb. 1981); *In re Breit,* 460 F. Supp. 873, 875 (E.D. Va. 1978); *Ackerson v. United States,* 277 F. Supp 475, 477 (W.D. Ky. 1967); and *Fors Farms, Inc. v. Commissioner,* an unreported case (W.D. Wash. 1966) (17 AFTR 2d 222, 66-1 USTC par. 9206). See also *Ellisberg v. Commissioner,* 9 T.C. 463 (1947), and *Pierce v. Commissioner,* 41 B.T.A. 1261 (1940), wherein the issue was whether a guarantee could be characterized as a gift.

these opinions consider traditional debt-equity principles in determining whether to characterize a guaranteed debt as a capital contribution.[3] Despite this heavy weight of authority, the majority opinion "decline[s] to adopt traditional debt-equity principles in this case." Majority opinion at p. 215. The majority opinion bases its declination to apply traditional debt-equity principles on its erroneous interpretation of *Blum v. Commissioner*, 59 T.C. 436 (1972), and on its unsound refusal to follow *Selfe v. United States*, 778 F.2d 769 (11th Cir. 1985).

The majority opinion states that in *Blum*—

[the Tax Court] declined to decide the issue as to the applicability of debt-equity principles because the taxpayer had failed his burden of proving that the bank in substance had loaned the funds to the taxpayer and not to the corporation. *Blum v. Commissioner*, 59 T.C. at 439, n. 4. [Majority opinion at p. 215.]

The majority opinion misstates the holding in *Blum* wherein the Court stated:

As we stated in *Santa Anita Consolidated, Inc.* [v. *Commissioner*, 50 T.C. 536, 550 (1968)], "Whether such debt [guaranteed debt] is to be treated as an indirect capital contribution must be resolved by an investigation of the facts in light of traditional debt-equity principles." In the present fully stipulated case, after applying many of those traditional principles, we find that petitioner simply has not carried his burden of proof and has not convinced this Court that the guaranteed loans should properly be characterized as equity investments. [*Blum v. Commissioner, supra* at 439-440. Bracketed phrase, "guaranteed debt," in original.]

Contrary to the majority opinion, the Tax Court did not decline to apply traditional debt-equity principles because the taxpayer failed in his burden of proof, but rather applied traditional debt-equity principles to determine that the taxpayer failed in his burden of proof. The distinction is more than merely semantical. As will be seen below, petitioners herein have carried their burden of proof. Accordingly, a proper interpretation of *Blum* and a proper application of traditional debt-equity principles, as man-

---

[3]See *Blum v. Commissioner, supra; Smyers v. Commissioner, supra; Santa Anita Consolidated, Inc. v. Commissioner, supra; La Staiti v. Commissioner, supra; Selfe v. United States, supra; In re Lane, supra; Casco Bank & Trust Co. v. United States, supra; Plantation Patterns, Inc. v. Commissioner, supra; Murphy Logging Co. v. United States, supra; Kavich v. United States, supra; In re Breit, supra; Ackerson v. United States, supra;* and *Fors Farms, Inc. v. Commissioner, supra.*

dated by *Blum,* would lead to a result contrary to the result reached by the majority.[4]

In *Selfe v. United States, supra,* the 11th Circuit held that traditional debt-equity principles are applicable in determining whether a shareholder-guaranteed subchapter-S corporate debt should be recharacterized as a capital contribution.[5] The majority disagreed with the 11th Circuit and refused to follow *Selfe* because *Selfe* relied on *Plantation Patterns, Inc. v. Commissioner,* 462 F.2d 712 (5th Cir. 1972), affg. T.C. Memo. 1970-182, and *In re Lane,* 742 F.2d 1311 (11th Cir. 1984).

*Plantation Patterns* held that corporate deductions for interest paid on shareholder-guaranteed corporate debts were improper and the principal payments[6] made on such debts were taxable income to the guaranteeing shareholder because such debts were in substance capital contributions. The majority opinion determined that *Selfe's* reliance on *Plantation Patterns* is inappropriate because:

the corporation in *Plantation Patterns* was a subchapter C corporation. We decline to apply the debt-equity analysis used in *Plantation Patterns* to the guarantee of a loan to a subchapter S corporation. [Majority opinion at p. 216.]

This determination by the majority opinion not to apply subchapter C precedent to subchapter S corporations evinces a lack of understanding as to the purpose of applying traditional debt-equity principles to a given situation. Traditional debt-equity principles are applied to determine the substance of a transaction. After making such

---

[4]The majority opinion attempts to draw undue weight from note 4 in *Blum v. Commissioner, supra* at 439, which provides:

"The respondent has argued that the entire equity-contribution argument espoused by petitioner is inimical to the subch. S area. Because of our holding that the facts do not warrant the applicability of this doctrine to the present case we will not consider this rather fascinating question."

It is clear that "doctrine" as used in the note does not mean "the applicability of debt-equity principles to determine if shareholder-guaranteed debt should be characterized as a capital contribution," but rather means "characterization of a shareholder-guaranteed corporate debt as a capital contribution after evaluation of traditional debt-equity principles." Consider the Court's textual statement, "after applying many of those traditional principles, we find * * * ." *Blum v. Commissioner, supra* at 439, quoted herein, *supra* at 222. Note 4 in *Blum* was improperly relied on by the majority.

[5]J. Eustice & J. Kuntz in Taxation of S Corporations, par. 10.03[2][i], n. 184 (rev. 2d ed. Supp. 1987), refer to *Selfe v. United States, supra,* as a "well reasoned opinion."

[6]See note 24 *infra.*

determination, the substance of the transaction, not the form, is evaluated for Federal income tax purposes. See *Diedrich v. Commissioner*, 457 U.S. 191, 195 (1982) (substance, not form, controls). Determining the substance of a transaction is the initial step in resolving a given issue and transcends the legal analysis. The substance of a particular transaction is fixed for that transaction. It does not vary depending upon the legal analysis to which it will be subjected. If a guarantee of a corporate debt is in substance a capital contribution, then it is a capital contribution regardless of whether the corporation is a subchapter S corporation or a subchapter C corporation. That the substance of the transaction transcends the legal analysis is illustrated in *Plantation Patterns*. Interest is deductible by subchapter C and subchapter S corporations. Sec. 163. The disallowance of the interest deduction in *Plantation Patterns* was independent of the corporation's status as a subchapter C or subchapter S corporation.[7]

The majority attempts to gain support by quoting the following passage from a Senate Finance Committee report:

The amount of the net operating loss apportioned to any shareholder * * * is limited under section 1374(c)(2) to the adjusted basis of the shareholder's investment in the corporation; that is, to *the adjusted basis of the stock in the corporation owned by the shareholder* and the adjusted basis of any indebtedness of the corporation to the shareholder. [S. Rept. 1983, 85th Cong., 2d Sess. 220 (1958), 1958-3 C.B. 922, 1141. Emphasis added.]

See majority opinion at p. 217. Where the guaranteed loan is treated in substance as a capital contribution, the guaranteeing shareholder's adjusted basis in the stock of the corporation will be increased,[8] and so would the shareholder's "investment in the corporation," as that phrase is used by the Senate Finance Committee. Accordingly, the Senate Finance Committee's report *could* be read as an expression of congressional intent to allow an increase

---

[7]Consider the following hypothetical:

Corporation A, a C corporation, pays "interest" on a shareholder-guaranteed debt to a bank. Respondent determines and this Court agrees that because the shareholder-guaranteed debt is in substance a capital contribution, the interest deduction is not allowable. Later corporation A becomes an S corporation. Would the "interest" payments now be deductible under the majority opinion's analysis?

[8]*Frantz v. Commissioner*, 83 T.C. 162, 172 (1984), affd. 784 F.2d 119 (2d Cir. 1986).

in the section 1374(c)(2) limitation where a shareholder-guaranteed corporate debt is in substance a capital contribution. Actually, though, the Senate Finance Committee report cannot fairly be read as an expression of congressional intent either to allow or disallow an increase in the amount of the section 1374(c)(2) limitation where a shareholder-guaranteed corporate debt is in substance a capital contribution.

Whatever sin was committed by the 11th Circuit in relying on subchapter C precedent in a subchapter S case, this Court has committed on innumerable occasions.[9] We have even stated, in *Blum v. Commissioner, supra* at 439:

regardless of the context in which a debt-equity determination arises, we can see no distinction in principle between the case before us [relating to a subchapter S corporation] and the numerous cases in the area which serve as judicial guideposts [relating to subchapter C corporations]. [Citation and fn. ref. omitted.]

Further, respondent is not here arguing that subchapter C precedent is inapplicable to subchapter S cases. It is unnecessary for the majority opinion to reach this issue, criticize the 11th Circuit for relying on subchapter C precedent in a subchapter S case, while ignoring the innumerable occasions in which this Court has done the same, and directly contradict language in our opinion in *Blum,* where neither party is asking the Court to do so. The 11th Circuit's reliance on *Plantation Patterns* is not an appropriate basis for the majority to decline to follow *Selfe.*

The majority opinion also attempts to impugn *Selfe* for its reliance on *In re Lane, supra.* In that case, the taxpayer claimed a bad debt deduction for payments made pursuant to his guarantee of a loan made to a corporation in which he was a shareholder.[10] The 11th Circuit considered traditional debt-equity principles and concluded that as of the time of the guarantee, the taxpayer, not the corporation, was the true debtor and that the taxpayer had made a capital

---

[9]Citation to subch. S cases relying on subch. C precedent would serve no purpose. Suffice it to say that all, or nearly all, subch. S cases cite subch. C precedent or subch. S precedent which relied on subch. C precedent.

[10]The taxpayer in *In re Lane, supra,* did not actually make payments; rather, assets belonging to the taxpayer were sold to satisfy the obligation arising from the guarantee. We see no distinction between the two and analyze *In re Lane, supra,* as if the taxpayer did make payments pursuant to the guarantee.

contribution of the loan proceeds to the corporation. *In re Lane, supra* at 1320. Payments later made pursuant to the guarantee could not be considered bad debts. The 11th Circuit disallowed the claimed deductions. *In re Lane, supra* at 1320.

The majority states,

In *Lane*, the shareholder had actually paid the amounts he had guaranteed and, therefore, the amounts he paid *could* be considered a capital contribution. [Majority opinion at p. 217. Emphasis added.]

It is true that the taxpayer in *In re Lane* had made payments pursuant to the guarantee. However, the holding in *In re Lane*, which was the basis of *Selfe's* reliance on *In re Lane*, was that a shareholder-guaranteed corporate debt can, depending on an analysis of traditional debt-equity principles, be characterized as a capital contribution, and the analysis of whether the shareholder-guaranteed debt is to be so characterized is made as of the time of the guarantee, not at some later date, e.g., when payment is made pursuant to the guarantee. Accordingly, *In re Lane* was properly relied upon in *Selfe*.[11]

The reasons advanced in the majority opinion for not following *Selfe* are not convincing. *Selfe* is on all fours, and its holding that traditional debt-equity principles are applicable in determining whether a shareholder-guaranteed corporate debt is in substance a capital contribution should be followed.

---

[11]*In re Lane* was also relied on in *Selfe* for the proposition that the taxpayer as well as the Government may question whether a shareholder's advance to a corporation is debt or equity. Neither the majority nor respondent argues that petitioners are precluded from arguing substance over form. In *Selfe v. United States, supra*, the taxpayer was allowed to argue substance over form in claiming that her guarantee of a bank loan to an electing small business corporation in which she was a shareholder increased the amount of her sec. 1374(c)(2) limitation. The 11th Circuit stated:

"Although the question of whether a stockholder's advances to a corporation constitute debt or capital contributions is usually raised by the government, nothing in the Internal Revenue Code or our decisions suggests that the factors used to determine the substantive character of a taxpayer's interest in a corporation are available only to the government. *See In re Lane*, 742 F.2d at 1315; *cf. Peter E. Blum*, 59 T.C. 436, 439 (1972) (principles for resolving debt-equity determinations are consistent regardless of the context in which such determinations arise); *J.A. Maurer, Inc.*, 30 T.C. 1273 (1958). Accordingly, where the nature of a taxpayer's interest in a corporation is in issue, courts may look beyond the form of the interest and investigate the substance of the transaction. These situations present an exception to the general proposition that a shareholder/taxpayer is bound by the form of her transaction. *See Georgia-Pacific Corp. v. Commissioner*, 63 T.C. 790, 795-796 (1975). [*Selfe v. United States, supra* at 774.]

The majority, as stated earlier, decided not to apply traditional debt-equity principles to the issue presented. This decision was based on an erroneous interpretation of *Blum* and an unsound refusal to follow *Selfe.* Based on the opinions of this Court and the opinions of the First, Fifth, Ninth, and Eleventh Circuits, traditional debt-equity principles should be applied in determining whether a shareholder-guaranteed corporate debt should be characterized as a capital contribution.

In *Santa Anita Consolidated, Inc. v. Commissioner,* 50 T.C. 536, 550 (1968), and quoting *Santa Anita Consolidated, Inc.,* in *Blum v. Commissioner, supra* at 439, and *Smyers v. Commissioner,* 57 T.C. 189, 198 (1971), we stated:

Whether [guaranteed] debt is to be treated as an indirect capital contribution must be resolved by an investigation of the facts in light of traditional debt-equity principles.

In *Casco Bank & Trust Co. v. United States,* 544 F.2d 528 (1st Cir. 1976), the First Circuit held, *after applying traditional debt-equity principles,* that a shareholder's agreement to indemnify a bonding company that bonded the shareholder's corporation was in substance a capital contribution. In *Plantation Patterns, Inc. v. Commissioner, supra,* the Fifth Circuit held, *after applying traditional debt-equity principles,* that a shareholder's guarantee of a corporate debt was in substance a capital contribution. In *Murphy Logging Co. v. United States,* 378 F.2d 222 (9th Cir. 1967), the Ninth Circuit held, *after applying traditional debt-equity principles,* that a shareholder-guaranteed corporate debt was not in substance the shareholders' debt. In *In re Lane, supra,* the 11th Circuit held, *after applying traditional debt-equity principles,* that a shareholder's guarantee of a corporate debt was in substance a capital contribution. In *Selfe v. United States, supra,* the 11th Circuit *held that debt-equity principles should be applied* in determining whether a shareholder-guaranteed corporate debt should be characterized as a shareholder debt.[12] See also *Kavich v.*

---

[12]Appeal in this case lies to the Fourth Circuit. Accordingly we are not required by *Golsen v. Commissioner* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), to follow the opinions in *Casco Bank & Trust Co. v. United States, supra* (1st Cir.); *Plantation Patterns, Inc. v. Commissioner, supra* (5th Cir.); *Murphy Logging Co. v. United States, supra* (9th Cir.); *In re Lane, supra* (11th Cir.); or *Selfe v. United States, supra* (11th Cir.). Some commentators think that the Tax Court should be bound by Circuit Court precedent even when the case is not

*United States,* 507 F. Supp 1339 (D. Neb. 1981); *In re Breit,* 460 F. Supp 873 (E.D. Va. 1978); *Ackerson v. United States,* 277 F. Supp 475 (W.D. Ky. 1967); and *Fors Farms, Inc. v. Commissioner,* an unreported case (W.D. Wash. 1966, 17 AFTR 2d 222, 66-1 USTC par. 9706). Other than the majority opinion, there exists, to my knowledge, no authority that refuses to apply traditional debt-equity principles in determining whether a shareholder-guaranteed corporate debt is in substance a capital contribution.[13]

It is appropriate to consider traditional debt-equity factors in determining whether a shareholder-guaranteed corporate debt is in substance a capital contribution because such factors facilitate a determination of whether the funds advanced to a corporation were placed at the risk of the corporation's business. *In re Lane, supra* at 1314. Funds placed at the risk of the corporation's business represent equity, not debt. *Slappey Drive Ind. Park v. United States,* 561 F.2d 572 (5th Cir. 1977). As a general rule, third-party creditors, such as the Bank of Virginia herein, seek a more reliable investment for the funds they advance and avoid placing such funds at the risk of a corporation's business. Where such a third-party creditor makes a loan to a corporation, such loan is guaranteed by the corporation's shareholders, and the proceeds of such loan are ultimately placed at the risk of the corporation's business, the loan is properly treated as made by the third-party creditor to the shareholder/guarantors. As to the third-party creditor, the money lent is not at the risk of the corporation's business because the third-party creditor looks to the guarantor for repayment. As to the shareholder/guarantor, the money is at the risk of the corporation's business and is treated as an equity investment.

---

appealable to that Circuit Court. See Geier, "The Emasculated Role of Judicial Precedent in the Tax Court and Internal Revenue Service," 39 Okla. L. Rev. 427 (1986). At any rate, were this case appealable to the First, Fifth, Ninth, or Eleventh Circuit Courts of Appeals, *Golsen v. Commissioner, supra,* might well have mandated a result different from the result reached by the majority.

[13]In *Brown v. Commissioner,* 706 F.2d 755, 756 (6th Cir. 1983), affg. T.C. Memo. 1981-608, the Sixth Circuit accepted the Tax Court's holding that, with respect to the transaction there at issue, "the substance matched the form." The Sixth Circuit did not reveal the analysis it utilized in deciding to accept the Tax Court's holding, but it clearly did not refuse to apply traditional debt-equity principles in making that decision.

For the foregoing reasons, I believe that the majority inauspiciously erred in deciding not to apply traditional debt-equity principles to the issue presented.

## II. *Two types of economic outlay exist.*

The majority opinion, citing *Brown v. Commissioner,* 706 F.2d 755 (6th Cir. 1983), affg. T.C. Memo 1981-608, states that to increase the basis in the stock of a subchapter S corporation, there must be an economic outlay. Majority opinion at p. 212. I agree that economic outlay is required. However, because the majority did not determine the substance of the transaction by applying traditional debt equity factors, the majority did not discern the existence of a second type of economic outlay, the type that petitioners have proven to be present here.

The economic outlay requirement was born of the Supreme Court's opinion in *Putman v. Commissioner,* 352 U.S. 82 (1956). See *Perry v. Commissioner,* 47 T.C. 159, 164 (1966). There, a shareholder had guaranteed a loan by a third-party creditor to the shareholder's corporation. The shareholder was required by the third-party creditor to pay the corporation's loan in accordance with the guarantee. The Supreme Court held that upon payment of the loan, the shareholder was subrogated to the third-party creditor's rights, and the corporate debt to the third-party creditor was transformed into a corporate debt to the shareholder. The corporation was unable to pay its debt to the shareholder, and the Supreme Court held that the shareholder could deduct the amount paid pursuant to the guarantee as a bad debt but not as a loss incurred in a transaction entered into for profit.

The relevance of the *Putnam* opinion to the issue at hand is that, where a shareholder guarantees a loan to his corporation, the loan is not treated as indebtedness of the corporation to the shareholder until the shareholder pays the loan pursuant to the guarantee. Upon payment of the loan, the debt of the corporation to the third-party creditor instantly becomes a debt of the corporation to the shareholder. As such, the debt becomes an "indebtedness of the corporation to the shareholder" within the meaning of section 1374(c)(2)(B), and the amount of the shareholder's

section 1374(c)(2) limitation is thereby increased. The payment by the shareholder/guarantor of the debt is the type of economic outlay referred to in *Brown v. Commissioner, supra.* See also *Raynor v. Commissioner, supra; Borg v. Commissioner, supra;* and *Perry v. Commissioner,* 47 T.C. 159, 164 (1966).

The applicability of *Putnam* extends only so far as the debt is initially the debt of the corporation. See *In re Lane, supra* at 1319; *Casco Bank & Trust Co. v. United States,* 544 F.2d 528 (1st Cir. 1976); and *Kavich v. United States,* 507 F. Supp. 1339 (D. Neb. 1981).[14] In *Putnam,* the debt was the corporation's debt prior to the payment by the shareholder. There was no allegation or suggestion that the debt was the shareholder's prior to such time. For Federal tax purposes, where the debt is treated initially as the debt of the shareholder, payment of the debt by the shareholder will not result in a subrogation of creditors but rather will result in the extinguishment of the debt.

That is not to say that there can be no economic outlay, where the debt is initially treated as the shareholder/guarantor's debt. In such a situation, the shareholder/guarantor's deemed transfer of the loan proceeds to the corporation is the economic outlay. *Selfe v. United States, supra.* The economic outlay occurs upon the third-party creditor's disbursement of the loan proceeds, which are deemed transferred from the third-party creditor to the shareholder/guarantor to the corporation. *Selfe v. United States, supra; In re Lane, supra.* Thus, there are two types of economic outlay: the economic outlay, a la *Putnam,* where the debt is initially treated as a corporate debt, and the shareholder/guarantor pays the debt pursuant to the guarantee; and the economic outlay, a la *In re Lane,* where the debt is initially treated as the shareholder's debt, and the loan proceeds are deemed transferred from the third-party creditor to the shareholder to the corporation.

---

[14]In *In re Lane, supra,* relying on *Casco Bank & Trust Co. v. United States, supra,* and *Kavich v. United States, supra,* the 11th Circuit examined traditional debt-equity principles to determine that, as of the time the taxpayer guaranteed a nominal debt of his corporation to a bank, he, not his corporation, was in substance the debtor. The nominal corporate debt was treated as the taxpayer's debt with the loan proceeds being deemed transferred from the bank to the taxpayer to his corporation, with the latter transfer being a contribution to capital, not a loan. The 11th Circuit held that *Putnam v. Commissioner,* 352 U.S. 82 (1956), was not applicable and that the taxpayer was not entitled to a bad debt deduction.

The majority assumed there to be but one type of economic outlay, economic outlay a la *Putnam*. Constrained by this erroneous assumption, the majority correctly concluded that petitioners failed to make an economic outlay (economic outlay, a la *Putnam*) because petitioners had not paid the loan nominally made by the Bank of Virginia to VAFLA. However, had the majority not been constrained to such erroneous assumption, the majority would have considered the existence of the second type of economic outlay, economic outlay a la *In re Lane*. The majority's refusal to consider the existence and presence in this case of economic outlay, a la *In re Lane*, ultimately led the majority to reach the wrong result in this case.

III. *Application of traditional debt-equity principles in the present case indicates that petitioners' guarantee should be considered a capital contribution.*

The traditional debt-equity factors include the following: (1) The label given the instrument; (2) the presence or absence of a fixed maturity date; (3) the source of payments thereon; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to other creditors; (7) the intent of the parties; (8) "thin" or inadequate capitalization; (9) identity of interest between creditors and stockholders; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets, and (13) the failure of the debtor to repay on the due date or to seek a postponement. *In re Lane, supra; Texas Farm Bureau v. United States,* 725 F.2d 307, 311 (5th Cir. 1984); *Estate of Mixon v. United States,* 464 F.2d 394, 410 (5th Cir. 1972); *Fin Hay Realty Co. v. United States,* 398 F.2d 694, 696 (3d Cir. 1968).[15] These various factors are not equally significant. "The object of the inquiry is not to count factors, but to evaluate them." *Tyler v. Tomlinson,* 414 F.2d 844, 848 (5th Cir. 1969).

---

[15]See also sec. 385, the text of which is reproduced in note 8 in the majority opinion. Though sec. 385 was added by the Tax Reform Act of 1969, Pub. L. 91-172, sec. 415(a), 83 Stat. 487, 613, no regulations under this provision are currently in effect.

At first blush, the transaction at issue has the outward appearance of a debt transaction—a guaranteed loan with scheduled repayments. However, other factors clearly indicate the equity nature of the transaction.

Although the Bank of Virginia was nominally to look to VAFLA for repayment of the $300,000 loan, it is apparent that the Bank of Virginia looked solely to the shareholder/guarantors for repayment.[16] The shareholder/guarantors executed the guarantees prior to the time the Bank of Virginia advanced the loan proceeds. Their aggregate net worth was 10 times the amount of the loan and the aggregate value of their quick assets was slightly greater than the amount of the loan. "The loan was approved only because of the financial strength of the guarantors." Majority opinion at p. 209.

VAFLA's financial condition at the time the loan was made illustrates why the Bank of Virginia based its approval solely on the guarantees of the shareholder/guarantors. VAFLA's liabilities exceeded the value of its assets by $82,410.16. During its first 3 months of operations, it had lost $142,410.16. Its principal asset, and essentially its only asset, Six-Gun Park, was mortgaged to the previous owner of Six-Gun Park. The Bank of Virginia did not obtain a security interest in any of VAFLA's assets nor did it obtain a pledge of VAFLA's accounts receivable. The Bank of Virginia apparently viewed VAFLA's financial condition and the preexisting mortgage as making such courses of action futile.

VAFLA's financial statements as of September 30, 1979, less than 1 month after the Bank of Virginia advanced the $300,000, paint an even bleaker picture of VAFLA's financial condition. During its first taxable year, a short year, VAFLA lost $345,370.20. It then had a negative net worth of $185,370.20. Its debt-to-equity ratio was over 10 to 1. Its current assets of $42,041.10 were greatly overshadowed by its current liabilities of $294,321.65. VAFLA was a thinly capitalized corporation. See *Plantation Patterns, Inc. v. Commissioner, supra* at 722.

---

[16]VAFLA apparently intended for the Bank of Virginia to look to the shareholder/guarantors for repayment as well. VAFLA reported the $300,000 loan as a liability to shareholders, not as a liability to the Bank of Virginia.

VAFLA could not have borrowed money from a third-party creditor such as the Bank of Virginia without outside support, such as guarantors. A portion of the $300,000 loan proceeds, at least $162,736.83,[17] was used to acquire capital assets or used to reduce the outstanding balance of indebtedness incurred to acquire capital assets. See *Plantation Patterns, Inc. v. Commissioner, supra* at 722. ("Of critical importance in determining whether financial input is debt or equity is whether or not the money is expended for capital assets.") I consider the expenditure of funds to reduce debt incurred to acquire capital assets to be tantamount to expending such funds to acquire capital assets, particularly where, as here, there is only a short period of time between incurring debt to acquire capital assets and reducing such debt with other borrowings.

During the years in issue, VAFLA made principal payments on the $300,000 loan and all of the interest payments. The shareholder/guarantors made no payments of principal or interest on the $300,000 loan. I do not consider this factor to be indicative of a true debt transaction. "The transaction must be judged on the conditions that existed when the deal was consummated, and not on conditions as they developed with the passage of time." *Plantation*

---

[17]The $162,736.83 figure was arrived at as follows: During VAFLA's taxable year ended Sept. 30, 1979, VAFLA used funds to (1) acquire capital assets, (2) reduce the outstanding balance of indebtedness incurred to acquire capital assets, (3) pay organizational expenses, (4) prepay insurance, (5) purchase inventory, and (6) finance its operations. As of Sept. 30, 1979, VAFLA had $4,200 in cash. Accordingly, it expended $295,800 on a combination of the six items described above. Financing operations required $102,009.63 [VAFLA's loss for its taxable year ended Sept. 30, 1979, was $345,370.20. However, several of the items contributing to VAFLA's loss did not require the expenditure of cash during such year. They were: depreciation—$88,845.35; accrued but unpaid sales tax—$1,969.91; accrued but unpaid property tax—$13,511.14; accrued but unpaid interest—$69,183.22; and various accrued but unpaid items represented by accounts payable—$69,850.95. After adjusting for these items, VAFLA made cash expenditures to finance its operations of only $102,009.63.], the purchase of inventory required $5,079.29 [The inventory may have been purchased on credit. If so, $5,079.29 of the $69,850.95 of accounts payable should have been considered incurred to acquire inventory and should not have been considered an accrued but unpaid item in determining the amount of VAFLA's cash expenditures to finance its operations. See the immediately preceding bracketed material. As such, VAFLA's cash expenditures to finance its operations would be $5,079.29 more and its cash expenditures to purchase inventory $5,079.29 less. The items would cancel one another out in determining the amount expended by VAFLA to acquire capital assets and to reduce the outstanding balance of indebtedness incurred to acquire capital assets.], the prepayment of insurance required $25,282.87, and the payment of organizational expenditures required $691.38 [Organizational expenditures may have been paid with credit. See the immediately preceding bracketed material.]. Accordingly, at least $162,736.83 of the $300,000 loan proceeds was used to acquire capital assets or to reduce the outstanding balance of debt incurred to acquire capital assets.

*Patterns, Inc. v. Commissioner, supra* at 723. Citations omitted. At any rate, VAFLA was able to make the principal and interest payments only as a result of $800,000 of loans and shareholder contributions.[18]

Not all of VAFLA's shareholders guaranteed the $300,000 loan. However, shareholders other than petitioners, both guarantors of the $300,000 loan, advanced $800,000 to VAFLA as loans and capital contributions.[19] The $800,000 received from other shareholders may have made the totals of each of the shareholders' loans and capital contributions to VAFLA proportionate to their stockholdings in VAFLA.

The Bank of Virginia's approval of the $300,000 loan was based solely on the guarantees of the shareholder/guarantors. The financial health of the shareholder/guarantors, vigorous, and VAFLA, feeble, indicates that the Bank of Virginia prudently and appropriately looked solely to the shareholder/guarantors for repayment. "Under the principles of *Plantation Patterns,* a shareholder guarantee of a loan may be treated for tax purposes as an equity investment in the corporation where the lender looks to the shareholder as the primary obligor. Essential to the *Plantation Patterns* court's analysis was that the notes guaranteed by the shareholder were issued by a thinly capitalized corporation and had more equity characteristics than debt." *Selfe v. United States, supra* at 774. VAFLA was thinly capitalized. More than half of the $300,000 was used to acquire capital assets or to reduce the outstanding balance of indebtedness used to acquire capital assets. VAFLA could not have borrowed money from a third-party creditor such as the Bank of Virginia without outside support, such as guarantors. Payments on the $300,000 loan were made from funds provided by shareholders. I would hold that the Bank of Virginia in substance lent the $300,000 to the shareholder/guarantors who made a capital contribution thereof to VAFLA.[20] As a result, petitioners herein, two of

[18]The Sept. 30, 1980, financial statements show that during VAFLA's taxable year ended on Sept. 30, 1980, VAFLA received from shareholders $600,000 reported as a loan and $200,000 reported as a capital contribution. Petitioners did not participate in either the $600,000 or the $200,000 advance.

[19]See note 18 *supra.*

[20]I recognize that a corporation will lose its status as an electing small business corporation if it has more than one class of stock. Sec. 1371(a)(4). I do not consider the seven shareholder/guarantors' deemed equity investments to give rise to a second "class of stock"

the shareholder/guarantors, should be entitled to an increase in the amount of their section 1374(c)(2) limitation.

To determine the amount of the section 1374(c)(2) limitation each petitioner is entitled to, I would look to State law to determine what each petitioner's legal rights and obligations are as a result of their guaranty of the $300,000 loan. See *Burnet v. Harmel,* 287 U.S. 103, 110 (1932). ("The state law creates legal interests but the federal statute determines when and how they shall be taxed.") The guaranty signed by petitioners states that it "shall be governed and construed in accordance with the laws of the State of Virginia." Accordingly, I would look to Virginia State law.

Each of the shareholder/guarantors bound themselves to jointly and severally guarantee the $300,000 indebtedness of VAFLA to the Bank of Virginia. Although the shareholder/guarantors may have owned various percentages of VAFLA, their obligations arising from their guarantees were identical.[21] See *Cooper v. Greenberg,* 191 Va. 495, 61 S.E.2d 875, 877 (1950). Pursuant to the guarantees, the Bank of Virginia could proceed against any one of the shareholder/guarantors for the full amount of the indebtedness without first attempting to collect from VAFLA. A shareholder/guarantor required to pay the indebtedness could proceed against the other shareholder/guarantors pursuant to the equitable principle of contribution "that where two or more persons are subject to a common burden it shall be borne equally, since the law implies a contract between them to contribute ratably towards the discharge of the obligation." *Wiley N. Jackson Co. v. City of Norfolk,* 197 Va. 62, 87 S.E.2d 781, 784 (1955).

Although the shareholder/guarantors were each obligated to pay the full amount of VAFLA's indebtedness to the Bank of Virginia, I would conclude in light of their rights to contribution that the shareholder/guarantors were each effectively obligated to pay only their aliquot portion of the indebted-

---

within the meaning of sec. 1371(a)(4). See *Amory Cotton Oil Co. v. United States,* 468 F.2d 1046 (5th Cir. 1972); *Estate of Allison v. Commissioner,* 57 T.C. 174 (1971); *Stinnett v. Commissioner,* 54 T.C. 221 (1970).

[21]Respondent contends, and I agree, that petitioner Anthony D. Cuzzocrea should be treated no differently than the other shareholder/guarantors. I consider his guarantee which is limited to $300,000 "plus any other indebtedness related thereto and any costs and expenses * * * incurred * * * to enforce this guaranty" to be, in effect, indistinguishable from the guarantees of the other shareholder/guarantors.

ness. See *Cooper v. Greenberg, supra.*[22] Since there were seven shareholder/guarantors, each was effectively obligated to pay one-seventh of the $300,000 debt or $42,857.[23] I would conclude that both petitioners should be deemed to have made a contribution to VAFLA's capital in the amount of $42,857.

A collateral issue presented by the manner in which I would decide this case is the proper treatment of principal and interest payments made by VAFLA. Since the $300,000 received by VAFLA would be treated as a capital contribution, the payments of principal and interest made by VAFLA would have to be treated as cash distributions by VAFLA to the shareholder/guarantors, one-seventh each, and as payments of principal and interest by the shareholder/guarantors, one-seventh each, to the Bank of Virginia.[24]

## IV. *Conclusion.*

The majority opinion has reached an incorrect result because (1) it did not recognize the distinctions between section 1374(c)(2)(A) and section 1374(c)(2)(B), (2) it incorrectly stated the *Blum* opinion, (3) it unsoundly refused to follow *Selfe*, (4) it erroneously believed subchapter C precedent is not applicable to a subchapter S corporation, (5) it unsoundly refused to apply traditional debt-equity principles to determine the substance of the transaction at issue, (6) it refused to follow, without discussion, numerous opinions of this and other courts, and (7) it refused to recognize the existence and presence of economic outlay, a la *In re Lane.* This Court has dangled an elusive carrot before taxpayers' eyes for more than 15 years stating that on the proper showing, a shareholder-guaranteed corporate debt can be characterized as a capital contribution.[25]

---

[22]See also *In re Breit,* 460 F. Supp. 873, 876 n. 3 (E.D. Va. 1978). ("Their fellow guarantors * * * were equally liable in the event of nonpayment by the corporation, and appellants failed to show why all the guarantors should not share equally in the deduction.")

[23]The determination of the number of shareholder/guarantors and the amount of the obligation is to be made as of the time the loan proceeds are advanced because it is at this time that the shareholder/guarantors are deemed to make a capital contribution.

[24]See *Plantation Patterns Inc. v. Commissioner,* T.C. Memo. 1970-182, wherein respondent was contending that only the principal payments made by the corporation on the shareholder-guaranteed debt were taxable to the taxpayer-shareholders because of the offsetting interest deductions which would be available to them.

[25]See *Blum v. Commissioner,* 59 T.C. 436 (1972); *Schneiderman v. Commissioner,* T.C. Memo. 1987-551 ("A loan will be deemed to have been made to its guarantors only if the guarantors can show, among other things, that the lender looked primarily to them for repayment.");

Petitioners have here made the proper showing, to which the majority states, "we were only kidding."

For the foregoing reasons, I respectfully dissent.

*Bader v. Commissioner*, T.C. Memo. 1987-30 ("petitioners [shareholder/guarantors] have not established that CNB [the third-party creditor] looked primarily to them for satisfaction of the debt."); *Blackman v. Commissioner*, T.C. Memo. 1981-244 ("Although we accept petitioners' general proposition that the substance of a transaction and not merely the form in which it is cast controls its treatment for tax purposes, petitioners have failed to convince this Court that the guaranteed loans should be characterized as indirect capital contributions."); and *Albert v. Commissioner*, T.C. Memo. 1980-567 ("this is not a case where a Subchapter S corporation was thinly capitalized, or insolvent at the time of the [guaranteed] loan. * * * Nor is there any suggestion from the facts herein that the guaranteed loan was in substance an equity contribution by the taxpayer.").

