T.C. Memo. 1998-63


UNITED STATES TAX COURT


RICHARD J. SALEM AND EILEEN L. SALEM, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ROBERT S. SAXON AND BERNICE S. SAXON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 8792-95, 8793-95.        Filed February 17, 1998.


<u>Vernon Jean Owens</u>, for petitioners.

<u>William R. McCants</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WRIGHT, <u>Judge</u>:  In these consolidated cases respondent
determined the following deficiencies and penalty in petitioners'
Federal income taxes:

| Petitioners | Docket No. | Year | Deficiency | Penalty Sec. 6662(a) |
|---|---|---|---|---|
| Richard J. and Eileen L. Salem | 8792-95 | 1987 1990 | $49,074 19,179 | None $2,487 |
| Robert S. and Bernice S. Saxon | 8793-95 | 1990 | 7,202 | None |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

We must decide the following issues:

(1) Whether, under section 1366, petitioners Richard J. Salem and Bernice S. Saxon have sufficient basis from which to deduct losses incurred by Salem, Saxon & Nielsen, P.A., an S corporation;

(2) whether petitioner Richard J. Salem realized gain of $59,224 upon the distribution of real property from Gulf Properties of Pinellas County, Florida III, Inc., an S corporation; and

(3) whether, if such gain was realized, petitioners Richard J. Salem and Eileen L. Salem were negligent in failing to report it.

FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found.  The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

A.   Petitioners

Petitioners Richard J. Salem (Mr. Salem) and Eileen L. Salem (Mrs. Salem) are married and resided in Tampa, Florida, when they filed their petition in this case.  Mr. and Mrs. Salem are hereinafter sometimes referred to as the Salems.

Petitioners Robert S. Saxon (Mr. Saxon) and Bernice S. Saxon (Mrs. Saxon) are married and resided in Clearwater, Florida, when they filed their petition in this case.  Mr. and Mrs. Saxon are hereinafter sometimes referred to as the Saxons.

B.   Salem, Saxon & Nielsen, P.A.

1.   Background

Mr. Salem and Mrs. Saxon are attorneys who are shareholders in the law firm of Salem, Saxon & Nielsen, P.A. (SS&N).  During the taxable year 1990, Mr. Salem owned 450 shares of the stock of SS&N, and Mrs. Saxon owned 50 shares.  Their general law practice is business oriented and includes litigation.  Mr. Salem was admitted to practice before this Court in 1975.

During the mid-1980's, SS&N began borrowing money from the Bank of Tampa (the bank).  From 1987 through 1990, the bank made loans to SS&N on the following dates in the amounts indicated:

| No. | Date | Amount |
|-----|------|--------|
| 1 | 9/22/87 | $150,000 |
| 2 | 1/28/88 | 100,000 |
| 3 | 9/27/88 | 150,000 |
| 4 | 7/18/89 | [1] 360,000 |
| 5 | 12/04/89 | 275,300 |
| 6 | 12/04/89 | [2] 635,300 |
| 7 | 3/12/90 | 137,971 |
| 8 | 3/12/90 | 150,000 |
| 9 | 3/12/90 | [2] 300,000 |
| 10 | 3/12/90 | [2] 816,097 |
| 11 | 6/30/90 | [3] 300,000 |
| 12 | 9/19/90 | [3] 66,112 |

[1] Increase and renewal of existing loan.
[2] Consolidation and renewal of existing loans.
[3] Renewal of existing loan.

All of the above loans were represented by notes signed by Mr. Salem or Mrs. Saxon as an officer of SS&N. All loans, except loan No. 1, were secured by SS&N's accounts receivable, furniture, fixtures, and equipment. All of the notes provided that the bank was given a lien and a security interest (obligor lien) in:

> all property of each Obligor now or at any time hereafter in the possession of Bank in any capacity whatsoever, including but not limited to any balance or share of any deposit, trust, or agency account, as security for the payment of this note * * *

The term "Obligor" included each maker, endorser, surety, and guarantor of the note. Mr. Salem personally guaranteed 100 percent of SS&N's debt to the bank, and Mrs. Saxon personally guaranteed 10 percent of the debt. Except for the obligor lien,

neither Mr. Salem nor Mrs. Saxon pledged any personal assets to secure SS&N's debt to the bank.

SS&N was a C corporation from 1981 through September of 1989. On December 15, 1989, SS&N elected to be an S corporation effective as of October 1, 1989.

The accounting firm of Laventhol & Horwath (L&H) prepared the corporate income tax return for SS&N for the taxable year ending December 31, 1989. Eileen Sharkey of L&H sent the following letter dated September 6, 1990, to Mr. Salem:

Dear Richard:

In preparing the corporate income tax return for the period ended December 31, 1989 for Salem, Saxon and Nielsen, P.A., we have discussed various issues with Bernice. This letter covers one particular tax item of significance, principally to you.

On December 31, 1989, the professional association had loans outstanding of approximately $710,000 payable to the Bank of Tampa. It is our understanding that the loans were made to Salem, Saxon and Nielsen, P.A., with your personal guarantee. The issue is the Internal Revenue Service's lack of recognition of a guarantee as part of tax basis as further discussed below. As you know, the professional association has incurred a loss of $43,330 for the year ended December 31, 1989. Your share of the loss is approximately $37,000 and represents a tax benefit on your individual return of approximately $12,000. By taking a tax position contrary to the Internal Revenue Service, your return is subject to controversy.

Subchapter S Corporation losses that pass through to the shareholders are fully deductible only to the extent that the shareholders have basis in the S Corporation stock, plus basis in their loans to the S Corporation (Internal Revenue Section 1366(d)(1)). Applying this provision to Salem, Saxon & Nielsen, P.A., your current basis would be de minimis, and your

deductible loss on your individual income tax return for 1989 would also be de minimis. Of course, the remaining loss would be available for the carryforward to future years. With your concurrence, we will take the tax return position that the loan guarantee provides you basis to take the losses. In order to avoid penalties in the event the Internal Revenue Service should prevail upon challenge, the rules require the tax return to be based on "substantial authority," as defined. We believe <u>Selfe v. United States</u>, * * * 778 F.2d 769 (11th Cir. 1985) provides such authority. In this case, the court applied a debt-equity analysis and held that a shareholder's guarantee of a loan made to a Subchapter S Corporation may be treated for tax purposes as an equity investment in the corporation where the lender looks to the shareholder as the primary obligor. However, this case is unique to the 11th Circuit and does not have the Commissioner's acquiescence. Therefore, upon examination, a controversy may arise.

The safest course of action and the one we recommend is to restructure the loans so that you are a co-maker rather than a guarantor. In this way, you can clearly demonstrate that you have basis in the losses which flow through on your individual income tax return and take full advantage of the concomitant tax benefits.

In September and October of 1990, Mr. Salem and Mrs. Saxon executed the following new notes (replacement notes) that, except for No. 14, replaced the existing notes representing SS&N's debt to the bank:

| No. | Date | Amount |
|-----|------|--------|
| 13 | 9/30/90 | [1]$275,000 |
| 14 | 9/30/90 | 25,000 |
| 15 | 9/30/90 | [2]300,000 |
| 16 | 10/18/90 | [3]66,112 |
| 17 | 10/18/90 | [4]757,805 |

[1] Renewal of loan No. 11.
[2] Consolidation and renewal of loans No. 13 & No. 14.
[3] Renewal of loan No. 12.
[4] Renewal of loan No. 10.

The replacement notes were signed by Mrs. Saxon as vice president on behalf of SS&N and by Mr. Salem and Mrs. Saxon as individuals. The security on the replacement notes remained the same as on the original. During 1990, SS&N made all payments to the bank on the loans.

SS&N filed Forms 1120S, U.S. Income Tax Return for an S Corporation, for the short taxable year ending December 31, 1989, and for the taxable year ending December 31, 1990. SS&N reported a loss of $245,711 for the 1990 taxable year, of which $221,140 was allocated to Mr. Salem and $24,571 was allocated to Mrs. Saxon.

SS&N's 1990 return reflects loans payable to shareholders in the amount of $1,110,287, while its ledger for 1990 reflects that loans in the same amount were payable to the bank. There were never any loan documents executed among SS&N, Mr. Salem, and Mrs. Saxon evidencing loans from the shareholders to the firm.

2. Minutes of Meetings of the Officer's Loan Committee and the Loan Committee.

Accurate minutes of the meetings of the bank's Officers Loan Committee and the Loan Committee (the minutes) were taken at the time the committees discussed making or extending loans to the bank's customers. Minutes of committee meetings considering personal loans to Mr. Salem and Mrs. Saxon were reported under the headings of "Richard J. Salem" and "Bernice Saxon". When the

committees discussed loans to SS&N, the minutes reflected the discussion under the heading of "Salem, Saxon, & Nielsen, P.A."

When the committees were considering extending loans to SS&N, the committees considered SS&N's (1) financial statements, (2) profitability and strong equity position, (3) deposits maintained with the bank, (4) proposed use of loan proceeds (working capital, construction costs of leasehold improvements), (5) security (furniture, fixtures, and equipment), (6) reputation and client base, (7) hiring of additional attorneys, and (8) real property interests. The committees also considered personal guaranties of Mr. Salem and Mrs. Saxon and the bank's total commitment to the firm. On one occasion, the committee considered Mr. Salem's annual income of $250,000 and limited debt.

The minutes of the Loan Committee meetings of October 11, 1990, August 8, 1991, and June 11, 1992, and the Officers Loan Committee meetings of July 30, 1991, and July 28, 1992, discuss Mr. Salem and Mrs. Saxon's guaranties of SS&N's loans, indicating that the committees were unaware of the substitute notes.

The minutes of the Loan Committee meeting of August 13, 1992, state that "the firm [SS&N] is currently undergoing an IRS audit, and they may have to change the borrower of the P.A. loans to the principals." The minutes of the Officers Loan Committee meeting of October 6, 1992, state:

Mr. Martin presented a request for the approval to change the borrower on the $1.1 million in loans to Salem, Saxon & Nielsen, P.A. to the names of Richard J. Salem, Bernice S. Saxon, and Richard A. Nielsen based on their pro-rata share ownership of the firm. * * * Mr. Martin indicated that as a result of an IRS audit the firm is undergoing, the partners are being questioned regarding the basis of their individual ownerships in the corporation. He mentioned that the P.A. will hypothecate its assets as collateral for the notes to the partners. He indicated that we will continue to have a $700M assignment of life insurance on Mr. Salem. He mentioned that Mr. Salem owns 85%, Ms. Saxon owns 10%, and Mr. Nielsen owns 5% of the firm. * * *

C. Gulf Properties of Pinellas County, Florida III, Inc.

Mr. Salem owned a one-third interest in an S corporation known as Gulf Properties of Pinellas County, Florida III, Inc. (Gulf Properties). On June 30, 1988, Gulf Properties purchased property located at 300 Gulf Boulevard, Belleair Shores, Florida (300 Gulf Boulevard), for the purchase price of $600,000. On December 28, 1990, Gulf Properties transferred title of 300 Gulf Boulevard to Mr. Salem, subject to a mortgage in the amount of $530,900. Between 1987 and 1992, real property values dropped significantly in the area of 300 Gulf Boulevard.

D. Petitioners' Income Tax Returns

The Salems filed a joint income tax return (Form 1040) and an amended return (Form 1040X) for the taxable year 1990. The Salems reported a net operating loss for 1990 in the amount of $192,546. In computing the 1990 net operating loss, the Salems included the $221,140 loss from SS&N. The Salems did not report

any gain or loss on the distribution of 300 Gulf Boulevard to Mr. Salem from Gulf Properties, nor did they report any interest income from SS&N related to the loans or from any deposits with the bank. The Salems filed a Form 1045, Application for Tentative Refund, for the taxable year 1987 claiming a net operating loss carryback of $127,465 from 1990.

The Saxons filed a joint return for 1990. On their return, the Saxons claimed the $24,571 loss from SS&N allocated to Mrs. Saxon.

E. Respondent's Determinations

In a statutory notice of deficiency dated March 7, 1995, issued to the Salems, respondent determined that the loss from SS&N was deductible to the extent of Mr. Salem's basis in his SS&N stock. Respondent further determined that Mr. Salem's basis in his stock as of January 1, 1990, was $259, and that the Salems' income for 1990 was increased by $220,881. Additionally, respondent determined that Mr. Salem realized a capital gain in the amount of $59,224 from the distribution of 300 Gulf Boulevard to him from Gulf Properties. Respondent computed the gain as follows:

| | |
|---|---|
| 1988 purchase price of property received | $600,000 |
| Less mortgage assumed | (530,900) |
| Distribution | 69,100 |
| Less shareholder's basis | (9,876) |
| Capital gain | 59,224 |

As a result of these adjustments, respondent determined that the Salems had taxable income of $74,153 for 1990.  As a result of the adjustments to the Salems' income for 1990, respondent determined that the net operating loss carryback to 1987 was zero and increased the Salems' 1987 income by $127,465.

In a statutory notice of deficiency dated March 7, 1995, issued to the Saxons, respondent determined that the loss from SS&N was deductible to the extent of Mrs. Saxon's basis in her interest in SS&N.  Respondent further determined that her basis as of January 1, 1990, was $29, and that the Saxons' taxable income, therefore, was increased by $24,542.

OPINION

1.   Claimed Net Operating Loss Deduction

Section 1366(d)(1) permits an S corporation shareholder to deduct a proportionate share of the corporation's net operating loss to the extent that the loss does not exceed the sum of the adjusted basis of the shareholder's stock in the corporation and any indebtedness of the S corporation to the shareholder.

Petitioners argue that the bank looked primarily to Mr. Salem and Mrs. Saxon for repayment of the loans at issue. Petitioners contend that the bank in substance made the loans to Mr. Salem and Mrs. Saxon, and they in turn made loans to SS&N. Petitioners conclude, therefore, that the loans constituted indebtedness of the S corporation to its shareholders.

Generally, in order to qualify as "indebtedness" under section 1366(d), the indebtedness of the S corporation to the shareholder must have arisen as a result of an actual economic outlay by the shareholder.  Harris v. United States, 902 F.2d 439, 443 (5th Cir. 1990); Estate of Leavitt v. Commissioner, 875 F.2d 420 (4th Cir. 1989), affg. 90 T.C. 206 (1988); Selfe v. United States, 778 F.2d 769, 772 (11th Cir. 1985).  This Court has consistently held that no form of indirect borrowing, be it guaranty, surety, accommodation, or otherwise, gives rise to indebtedness from an S corporation to the shareholders unless and until the shareholders pay part or all of the indebtedness. Estate of Leavitt v. Commissioner, 90 T.C. at 216; Raynor v. Commissioner, 50 T.C. 762, 770-771 (1968).  Prior to such payment, "liability" of the shareholders to a third party may exist, but not debt of the corporation to the shareholders. Raynor v. Commissioner, supra at 771.

The precise question before us is whether Mr. Salem and Mrs. Saxon made an economic outlay by signing as comakers of the notes payable to the bank.  Petitioners rely chiefly upon the opinion of the U.S. Court of Appeals for the Eleventh Circuit in Selfe v. United States, supra.  We are bound under the Golsen rule to follow the opinion of the Eleventh Circuit because an appeal in this case would be made to that court.  Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

The Eleventh Circuit agreed that economic outlay is required before stockholders in an S corporation may increase their basis, and that "In most cases, a mere guarantee of a corporate loan is insufficient, absent subrogation, to increase a taxpayer's basis." Selfe v. United States, supra at 774. The court noted, however, that "a guarantor who has pledged stock to secure a loan has experienced an economic outlay to the extent that that pledged stock is not available as collateral for other investments." Id. at 772 n.7.

Relying upon the principles of Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712 (5th Cir. 1972), affg. T.C. Memo. 1970-182, the Eleventh Circuit held that "a shareholder guarantee of a loan may be treated for tax purposes as an equity investment in the corporation where the lender looks to the shareholder as the primary obligor." Selfe v. United States, supra at 774. The court concluded that "under the principles of Plantation Patterns, a shareholder who has guaranteed a loan to a Subchapter S corporation may increase her basis where the facts demonstrate that, in substance, the shareholder has borrowed funds and subsequently advanced them to her corporation." Id. at 773. In Selfe, the specific issue before the court was whether any material facts were at issue making summary judgment inappropriate. Finding that such issues existed, the court

remanded for a determination of whether or not the lender looked primarily to the taxpayer for repayment.

We find that the facts in this case are substantially different from those in the Selfe case. In Selfe, the lender originally extended a credit line to the taxpayer in consideration of her pledge of 4,500 shares of stock in a corporation. When her business was later incorporated in a new corporation, the lender converted the loans made on the existing credit line to corporate loans, accompanied by the taxpayer's agreement guaranteeing the corporation's indebtedness to the bank. By contrast, in this case, the bank originally made the loans to the corporation. Although Mr. Salem and Mrs. Saxon guaranteed the loans, they never pledged any personal property to secure the debt.[1] After SS&N elected to be an S corporation, the initiative to add Mr. Salem and Mrs. Saxon as comakers came from them, not from the bank.

Furthermore, the record in this case shows that the bank looked primarily to the corporation for repayment of the notes. The minutes of the bank's loan committees indicate that, when the committees were considering extending loans to SS&N, the committees considered the corporation's financial statements,

---

[1] Petitioners argue that the notes granted the bank a lien on any property or deposits of the guarantors or comakers held by the bank. There is no evidence that the bank ever held any personal deposits of the Salems or Saxons.

profitability and strong equity position, deposits maintained with the bank, proposed use of loan proceeds, security (furniture, fixtures, and equipment), reputation and client base, hiring of additional attorneys, real property interests, and total indebtedness to the bank. Applying the test applied by the Eleventh Circuit in Selfe v. United States, supra, we find that the loans were made to the corporation and not to the shareholders. See Spencer v. Commissioner, 110 T.C. ____ (1998).

Petitioners contend that the facts in this case are the same as those in Gilday v. Commissioner, T.C. Memo. 1982-242. We disagree. In Gilday, the bank originally made the loan to the S corporation, and the shareholders guaranteed the loan. Later, the shareholders gave their personal note to the bank and the bank canceled the corporation's notes. We held that the substitution of the shareholders' note to the bank for the notes of the corporation created a valid debt from the corporation to the shareholder. We think the facts in this case are distinguishable from those in Gilday. As we noted in Hitchins v. Commissioner, 103 T.C. 711, 718 (1994), the shareholders in Gilday became the "sole obligors" to the bank. In this case petitioners merely signed the notes as comakers, the corporation's debt was not canceled, and the corporation's assets continued to secure the debt. The fact that petitioners were

comakers rather than guarantors does not change our analysis.
Nigh v. Commissioner, T.C. Memo. 1990-349.

Furthermore, after Mr. Salem and Mrs. Saxon signed the notes
as comakers, the bank continued to look primarily to the
corporation for repayment.  Applying the test of the Eleventh
Circuit in Selfe v. United States, supra, we conclude that,
regardless of the form of the notes, the debts in substance
continued to be loans from the bank to the corporation.

We conclude further that, under debt-equity principles, the
loans from the bank were made to SS&N, not to the shareholders,
and that the shareholders, therefore, did not lend or contribute
the loan proceeds to SS&N.  The loan documentation consistently
treats the loans as loans to SS&N.  The loans were to be repaid
in the normal course of events from the business revenues of
SS&N.  Upon default, the loans were to be repaid from the
collateral SS&N gave to secure the loans, including any life
insurance proceeds in the event of Mr. Salem's death.  See debt-
equity factors set forth in Plantation Patterns, Inc. v.
Commissioner, supra at 718.  For all purposes other than the
computations of the shareholder tax basis, SS&N and its
shareholders treated the loans as having been made primarily and
directly from the bank to SS&N.

Accordingly, we hold that petitioners are not entitled to deduct a net operating loss from SS&N in excess of their bases in their stock as determined by respondent.

2.  Whether Mr. Salem Realized Gain Upon Distribution of 300 Gulf Boulevard From Gulf Properties

Respondent's position is that during 1990 Mr. Salem realized a capital gain distribution of $59,224 when Gulf Properties transferred the title of 300 Gulf Boulevard to him.  Whether gain was realized depends upon the property's fair market value on December 28, 1990, when Mr. Salem received it.  Respondent contends that its fair market value on that date was $600,000. To the contrary, Mr. Salem contends that its fair market value was no more than $540,000, thus resulting in no gain to him.  The Salems did not report any gain on their joint income tax return for 1990 because Mr. Salem's basis in Gulf Properties ($9,876) and the mortgage indebtedness he assumed ($530,900) totaled $540,776, which he believed exceeded the property's fair market value on the date of the distribution.

Petitioners' evidence on the issue of the fair market value of the property consists of Mr. Salem's testimony and the report of an expert, Ron Lozano.  Respondent did not submit a report by an expert but relies upon the purchase price paid for the property by Gulf Properties in 1988 and values shown on the Salems' tax returns and financial statements.

The fair market value of property on a particular date is a factual question and requires consideration and weighing of all relevant evidence in the record.  Orth v. Commissioner, 813 F.2d 837, 842 (7th Cir. 1987), affg. Lio v. Commissioner, 85 T.C. 56 (1985); Mauldin v. Commissioner, 60 T.C. 749, 759 (1973); Kaplan v. Commissioner, 43 T.C. 663, 665 (1965).  The determination of the value of property is a matter of judgment rather than of mathematics.  Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347.  Since valuation is necessarily an approximation, it is not required that the value we determine be one as to which there is specific evidence, provided that it is within the range of figures that properly may be deduced from the record.  Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Hamm v. Commissioner, supra at 939-940.

Expert opinion is admissible if it will assist the trier of fact to understand evidence that will determine the fact in issue.  See Fed. R. Evid. 702.  The trier of fact must weigh such evidence in light of the demonstrated qualifications of the expert and all other credible evidence.  Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991); Parker v. Commissioner, 86 T.C. 547, 561 (1986).  The persuasiveness of an expert's conclusion depends largely upon the

disclosed facts on which it is based.  See Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244.  We are not bound by the formulas and opinions proffered by an expert, especially when they are contrary to our judgment.  Orth v. Commissioner, supra; Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139.  Instead, we may reach a decision of value based on our own analysis of all the evidence in the record.  Silverman v. Commissioner, supra; Hamm v. Commissioner, supra at 940-941.  While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any portion of such an opinion, Parker v. Commissioner, supra at 562.  We may reject the opinion of an expert in its entirety.  Orth v. Commissioner, supra; Parker v. Commissioner, supra at 562-565.  A sound valuation is based upon all relevant facts, and we may reach a decision as to the value of the property based on our own analysis of all the evidence in the record.  Silverman v. Commissioner, supra at 933; Hamm v. Commissioner, supra at 941.

Even if only one party proffers the opinion of an expert, such as is the case here, we are not required to accord that opinion total or even partial acceptance.  Tripp v. Commissioner, supra; Estate of Gilford v. Commissioner, 88 T.C. 38, 56 (1987). Where there is a significant error in that opinion, appropriate

adjustments will be made.  Estate of Gilford v. Commissioner, supra.  We note, however, that counsel for respondent did not see fit to cross-examine petitioners' expert during the trial of this case.

Petitioners' expert used the comparable sales method in arriving at a value for the property.  The "comparable sales" method functions by:  (1) Locating properties as physically similar as possible to the subject property which (2) have been sold on the open market in noncollusive, nonforced sales for cash or cash equivalent, within (3) a reasonable time of the date for which a value of the subject property is desired.  Once these properties are located, those features of the subject property which are most pertinent to its value are compared to those same features on the comparable properties.  Since no two sales and no two properties can be identical, the values of those features of the comparable properties which are relevant to the value of the subject property are adjusted until they are equivalent to those of the subject property.  This Court has found the comparable sales valuation method to be a reasonable one and has used it in the past.  Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979).

Petitioners' Expert Report

Petitioners' expert appraised the subject property in 1994. In his report, he concluded that the value of the property as of

August 4, 1993, was $575,000. Where an expert's report is based upon an incorrect assumption (such as the valuation date in this case), the Court may still use it to construct reliable estimates of value by adjusting for the faulty assumption. Anselmo v. Commissioner, 80 T.C. 872, 884-885 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). In making the valuation, petitioners' expert relied on comparable sales of three properties. The expert report provides the following additional information:

1. Single family homes or condominium units with a waterfront view will command the highest prices. Although bay view sites are desirable in the market place, bay view sites are considered to be an inferior view to the open gulf view of 300 Gulf Boulevard.

2. 300 Gulf Boulevard and comparables No. 2 and No. 3 are located directly on the Gulf of Mexico in the same subdivision. Since Comparable No. 1 is located on the bay in a neighboring subdivision within the area, a large adjustment for the inferior view was warranted.

3. The expert rated 300 Gulf Boulevard as being in above-average condition because the interior of the home had been renovated and modernized. The kitchen had been remodeled and had new cabinets. The exterior of the home needed painting, and some of the gutters were rotted. There were no functional or physical inadequacies noted during the inspection.

4.   Because of the lack of sales of gulf front properties, the expert found it necessary to expand the marketing timeframe.

Generally, sales of comparable properties represent the best evidence of the fair market value of real estate, and a sale of the subject property itself proximate in time to the relevant valuation date is the best evidence of fair market value. Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229, 1233 (1987). The following table describes and compares 300 Gulf Boulevard to three properties that were sold between September of 1992 and May of 1993, a period of approximately 17 to 29 months after the valuation date:

| ITEM | Subject 300 Gulf Blvd. | | Comparable No. 1 148 Aleta Dr. | | Comparable No. 2 320 Gulf Blvd. | | Comparable No. 3 360 Gulf Blvd. | |
|---|---|---|---|---|---|---|---|---|
| Proximity | | | 1 Mile Northeast | | 1 Lot North | | 2 Lots North | |
| Data Source | Inspection | | Public Records | | Public Records | | Public Records | |
| VALUE ADJUSTMENTS | | | | | | | | |
| Lot Size sq.ft. View | 19,600 Gulf | | 12,000 Bay | +75,000 | 19,600 Gulf | | 19,600 Gulf | |
| Construction/ Roof | CBS Shingle | | CBS Conc. | – 2,000 | CBS Conc. | – 2,000 | CBS Shingle | |
| Age (years) | 43 | | 24 | – 4,000 | 43 | | 20 | – 5,000 |
| Condition | Avg-Good | | Avg-Good | | Average | +5,000 | Avg-Good | |
| Total Room Count Bedrooms Baths | 9 3 3 | | 9 4 3.5 | – 1,000 | 9 4 3 | | 9 4 3 | |
| Gr. Living Space | 2,367 | | 3,290 | –18,600 | 3,412 | –20,900 | 2,730 | – 7,300 |
| Garage | 2 car | | 2 car | | 3 car | – 2,000 | 2 car | |
| Porch, Patio, Pools, etc. | None | | Pool & Spa | –10,000 | None | | Pool & Covered Patio | – 8,000 |
| Fireplaces | 1-Brick | | None | + 1,000 | 1-Brick | | None | + 1,000 |
| **Net Adjustment** | | | | **+40,400** | | **-19,900** | | **-19,300** |

The expert report computes comparable values of 300 Gulf Boulevard using the three comparable properties as follows:

|  | Comparable No. 1 | Comparable No. 2 | Comparable No.3 |
|---|---|---|---|
| Sale date | 5/93 | 1/93 | 9/92 |
| Sale price | $500,000 | $560,000 | $600,000 |
| Adjustments | 40,400 | -19,900 | -19,300 |
| Comp. value of Subject | 540,400 | 540,100 | 580,700 |

We have carefully considered all of the evidence presented and have relied more on evidence determined to be more persuasive. Specifically, we find comparable No. 2 to be the most persuasive evidence of the value of 300 Gulf Boulevard. We find that the fair market value of 300 Gulf Boulevard at the time of the transfer to Mr. Salem in December of 1990 was no greater than $540,100.

On the basis of that valuation, we hold that the Salems did not fail to report gain in 1990 on the distribution of the property to Mr. Salem.

3. Accuracy-Related Penalty

Respondent's determination of the accuracy-related penalty for negligence under section 6662(b)(1) with respect to the Salems pertains only to the omission from their 1990 income tax return of the Gulf Properties distribution of 300 Gulf Boulevard. Since we have held that the Salems did not fail to report gain from the distribution, it follows that they are not liable for the accuracy-related negligence penalty for 1990.

To reflect our conclusions on the disputed issues,

<u>Decisions will be entered under Rule 155</u>.